**Kenneth N. MacDONALD, Plaintiff,**

v.

**TIME, INC., Henry Anatole Grunwald, Mike Mallowe, and John Does 1 through 40, Defendants.**

Civ. A. No. 81–479.

United States District Court, D. New Jersey.

Jan. 12, 1983.

Walder, Sondak, Berkeley & Brogan by Thomas J. Spies, Newark, N.J., for plaintiff.

Winne, Banta & Rizzi by Peter A. Banta, Hackensack, N.J., for defendants.

OPINION

SAROKIN, District Judge.

Kenneth N. MacDonald brought this diversity action predicated upon allegedly defamatory articles published in the February 8, 1980 issue of *Time* and the February 1981 issue of *Life*. The amended complaint alleged four torts resulting from the two publications; libel, conspiracy, invasion of privacy and intentional infliction of emotional distress. All of the substantive counts relating to the *Time* article were dismissed by order of this court, dated September 28, 1981, because they were time-barred. The court, in the same order, denied defendants' motion for summary judgment dismissing the claims stemming from the *Life* article and the conspiracy count. The alleged defamatory article reads as follows:

> Lordi was confirmed as Chairman, but since then the Casino Control Commission has been badly singed once more; its Vice Chairman, Kenneth M. MacDonald, hastily resigned his post when his name was publicly linked to the FBI's Abscam investigation of official corruption and alleged Mob influence.

Mr. MacDonald died on April 17, 1982. By consent of all parties, representatives of

his estate have been substituted as plaintiffs.[1] Defendants now move for summary judgment dismissing the amended complaint on the ground that Mr. MacDonald's cause of action abated upon his death. Defendants also move to dismiss the complaint because of MacDonald's refusal to provide discovery. The court will address the summary judgment motion first.

The so-called Abscam investigation has received widespread and continuous publicity. The plaintiff was indicted by a grand jury and convicted in the press. One may assume that he and his family suffered untold humiliation, anguish, mental suffering and possible financial loss as a result.

Because of plaintiff's untimely death, the criminal charges will never be resolved. If this case is not tried, his survivors will never be afforded the opportunity to remove the cloud which has darkened the plaintiff's reputation and which will continue suspended over his survivors for their lifetimes. Even though he was the person allegedly defamed, they have good reason to wish the matter pursued.

To live in this day and age of advanced communication is to recognize the awesome power of the press. It can destroy a person with a banner headline or a thirty-second moment on television. With that awesome power comes a grave responsibility. Freedom of speech is given great latitude, and we frequently forgive the unforgivable in its name, in order to protect one of our most cherished freedoms.

But if the plaintiff had a valid cause of action here, there is no just reason why it should not survive his death. To say that a man's defamed reputation dies with him is to ignore the realities of life and the bleak legacy which he leaves behind.

There is no valid reason which should deny the family of Kenneth MacDonald the right to clear his name and seek compensation for its destruction. Why should a claim for a damaged leg survive one's death, where a claim for a damaged name does not.[2] After death, the leg cannot be healed, but the reputation can.

The cases which have held that a defamation claim does not survive death rest on some contrived fiction or technical label. If a man's livelihood has been destroyed because of defamation, why should that claim not survive, while a claim based upon negligence or breach of contract does survive.

In our desire to preserve freedom of the press, we must not totally ignore the rights of those who may be injured by its abuses or excesses. Whether such abuses or excesses exist in this case is to be decided by a jury, but plaintiffs should not be deprived of the opportunity of seeking and obtaining that determination.

It does not erode freedom of the press to remind those who exercise it that it carries the responsibility of fairness and truth. Although defendants argue that to allow libel actions to continue after the death of the defamed individual would chill freedom of the press, it is inconceivable that such a result would follow. To so conclude would mean that a newspaper would hesitate to publish a story for fear that the person defamed might die and his representatives would pursue his claim, yet would not hesitate to publish the same story if it thought that the subject would live and bring the action in his own name. It is ludicrous to suggest that the press would act in one way if the person defamed could bring an action, but act otherwise if his representatives could do so, in the event of his death. All that is in issue here is whether the representatives of a decedent can pursue the claim which he possessed in his lifetime; this case does not involve an action for the

1. Throughout this opinion, when "plaintiffs" is used, it refers to the representatives of the estate who have been substituted as parties; when "plaintiff" is used, it refers to Mr. MacDonald, the deceased.

2. Who steals my purse steals trash; 'tis something, nothing;
'Twas mine; 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed.

W. Shakespeare, *Othello*, Act III (1604).

defamation of one who is deceased at the time of publication.

As we provide the courts as a forum for protecting freedom of speech, so should we provide such forum for those who are unfairly destroyed by its abuses. The court, recognizing that New Jersey law is to be applied, finds that it is in accord with this court's conclusion that plaintiff's defamation action should survive.

At common law, the death of the sole plaintiff or sole defendant before final judgment terminated all actions for personal torts, including defamation. Prosser, Law of Torts 898 (4th ed. 1971). As have many states, New Jersey has, by statute, modified this common law rule to permit certain tort actions to survive the death of the plaintiff or defendant. N.J.Stat.Ann. 2A:15–3,–4 (1952 & Supp.1982), (herein called the survival statute). N.J.Stat.Ann. 2A:15–3 provides, in part: "[e]xecutors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living."

The issue presented to the court by defendants is whether the state's survival statute saves defamation actions from abatement. Plaintiff contends that defamation actions are included in the state's survival statute and do not abate upon the death of the injured person. Defendants contend that defamation actions are not included in the statute. Defendants focus on the statutory language, "to the person". They contend that defamation is injury to the reputation, and not to the person, and thus, defamation actions are excluded from the survival statute. Plaintiffs focus on the statutory language "trespass" and note that the New Jersey courts have construed it to be equivalent to "tort". *Ten Eyck v. Runk,* 31 N.J.L. 428, 431 (Sup.Ct.1866). Plaintiffs contend that defamation actions are included in the survival statute under this broad interpretation of "trespass".

The parties have presented conflicting case authorities to the court. The most recent case is *Weller v. Home News Publishing Co.,* 112 N.J.Super. 502, 271 A.2d 738 (Law Div.1970), construing the statute to include defamation actions whether or not special damages are involved. Defendants rely on *Alpaugh v. Conkling,* 88 N.J.L. 64, 95 A. 618 (Sup.Ct.1915), which construed the statute to exclude defamation actions where no special damages were alleged.

As stated above, in this diversity case the court must apply the law of New Jersey. Since there is no decision of that state's highest court directly addressing this issue, this court must discern what the state's highest court would rule, were it presented with this issue today. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981).

Defendants argue that this court should follow *Alpaugh* rather than *Weller,* because *Alpaugh* correctly followed a decision of New Jersey's highest court that sheds light on this question. *Cooper v. The Shore Electric Co.,* 63 N.J.L. 558, 44 A. 633 (E & A 1899). In *Cooper,* New Jersey's highest court held that a wrongful death action filed by the father of the deceased did not abate upon his death. The Court stated that the action survived because the statute authorizing the cause of action had created a property right in the widow or the next of kin. 63 N.J.L. at 565, 44 A. 633. *Cooper* is the source of the principle, discussed by the *Alpaugh* court, that torts involving pecuniary damages or special damages survive under the statute, while those involving only injury to reputation and feelings do not. It appears that in arriving at this conclusion the *Cooper* court misapplied an earlier decision, *Hayden v. Vreeland,* 37 N.J.L. 372 (Sup.Ct.1874). *Hayden* held that an action for breach of promise to marry did not survive the death of the injured party under the survival statute because it was a contract action, not a tort action. The *Cooper* court incorrectly cited *Hayden* for the principle that actions in which purely personal injuries are alleged, as opposed to pecuniary injuries, do not survive under the survival statute. 63 N.J.L. at 562, 44 A. 633.

The *Alpaugh* court, in part, relied on *Cooper* to conclude that "the legislature did not intend that libel or slander, considered purely as injurious to the feelings and reputation, and apart from special damage, should survive to the personal representative." 88 N.J.L. at 67, 95 A. 618. The court there denied a motion to substitute the personal representatives of the deceased as parties in a slander suit.

Defendants rely upon other decisions to support their position. In *Palmisano v. News Syndicate Co.,* 130 F.Supp. 17 (S.D.N.Y.1955) the court stated that "... apparently under New Jersey law the claim would abate", citing *Alpaugh* and the survival statute for support. 130 F.Supp. at 18. The court denied defendant's motion to dismiss a libel suit because the face of the pleadings were insufficient to determine whether New Jersey law would apply. That case contained no analysis and provides no further support for defendants' position. In *Meyer v. Peter,* 9 N.J.Misc. 1309, 157 A. 250 (Sup.Ct.1931) the court held that an action for malicious prosecution did not survive the death of the injured party where no special damages to property rights were alleged, relying on *Alpaugh.* In *Patrick v. Esso Standard Oil Co.,* 156 F.Supp. 336, 341 (D.N.J.1957) the court concluded that an action for malicious prosecution would not survive, based on *Meyer* and *Alpaugh.* All of these cases rely on the same authority, and add no additional reasoning.

Defendants also rely upon the language of two statutes of limitations in support of their position that "trespass to the person" does not include defamation actions. N.J. Stat.Ann. 2A:14–2 provides a two year limitation period for "... [e]very action at law for an injury to the person ..." N.J.Stat. Ann. 2A:14–3 provides a one year limitation period for "[e]very action at law for libel and slander." Defendants suggest that a comparison of these two statutes indicates that libel and slander actions are not actions for injury "to the person".

Finally, defendants point to recent New Jersey decisions addressing the accommoda-

tion of free speech interests and the protection of defamation laws: *Kotlikoff v. The Community News,* 89 N.J. 62, 444 A.2d 1086 (1982) (encouraging the use of summary judgment to weed out nonactionable claims and frivolous suits); *Maressa v. New Jersey Monthly,* 89 N.J. 176, 445 A.2d 376 (1982) (there is no constitutional right to maintain a libel action in New Jersey, and that state's shield law affords newspersons an absolute privilege not to disclose confidential sources and editorial processes in libel actions.) Defendants contend that these decisions represent a trend in New Jersey to restrict rather than expand the libel laws, and are indicative of an unwillingness to extend such claims to the estate of a deceased litigant. Defendants' position is clearly the majority rule among the states. *Robertson v. Wegmann,* 436 U.S. 584, 591 n. 6, 98 S.Ct. 1991, 1995 n. 6, 56 L.Ed.2d 554 (1978).

In contrast, plaintiffs rely upon the decision in *Weller v. Home News Publishing Co.,* 112 N.J.Super. 502, 271 A.2d 738 (Law Div.1970) as the most recent authority of the state courts on this issue. In *Weller,* the court held that the actions for libel and invasion of privacy survive the death of the injured party under the survival statute where no special damages are alleged. The court considered, and rejected, *Alpaugh* as a court of like jurisdiction *at nisi prius, Id.* at 505, 271 A.2d 738, noting that its result "is repressive and out of keeping with the preferable trend outside New Jersey." *Id.* In that case, Mrs. Weller died during the pendency of her libel action resulting from the publication of her photograph with an incorrect caption. Her daughter and son-in-law continued as parties to the suit. The court refused to grant summary judgment to the defendant on the claims of the deceased for libel and invasion of the right of privacy. The court concluded:

"To construe trespass to person as not encompassing libel or invasion of the right of privacy is to import a limitation into the survival statute which is not expressed. The term "trespass" in the statute is equated with "tort". It should

not be modified by implication to exclude torts in which damages for emotional distress, not physical injury, are sought. Any such distinction is arbitrary."

*Id.* at 506, 271 A.2d 738. The court also rejected as illogical any distinction based on the presence of special damages. *Id.* at 506–7, 271 A.2d 738.

This decision is in keeping with what Dean Prosser has recognized as the modern trend with survival statutes:

> ... the modern trend is definitely toward the view that tort causes of action and liabilities are as fairly a part of the estate of either plaintiff or defendant as contract debts, and that the question is rather one of why a fortuitous event such as death should extinguish a valid action. Accordingly, survival statutes gradually are being extended; and it may be expected that ultimately all tort actions will survive to the same extent as those founded on contract.

Prosser, Law of Torts, 901 (4th ed. 1971). But this position is clearly still the minority position.

The court has considered all of the authorities cited by the parties and finds that the *Weller* decision is the best indication of current New Jersey law. The older cases cited by defendants contain questionable reasoning, especially in light of current recognition of rights to compensation for injuries to feelings and reputation. See *Hume v. Bayer,* 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981) (recognizing independent tort of intentional infliction of emotional distress); *Portee v. Jaffee,* 84 N.J. 88, 417 A.2d 521 (1980) (discussing negligent infliction of emotional distress). The recent New Jersey cases that limit the protections of defamation law by encouraging the use of summary judgment to weed out non-meritorious claims do not indicate that meritorious actions should be further limited by abatement upon the death of the injured party. The *Weller* court considered, and rejected, the earlier authority, and placed New Jersey in the modern trend toward survival of all tort actions. The language of the survival statute indicates that the

legislature intended that defamation actions survive.

■ Having determined that a libel action survives the death of the injured party, the court next addresses defendants' argument that the complaint should be dismissed because of plaintiff's failure to provide discovery. Mr. MacDonald became the subject of a criminal proceeding after this action was filed. As a consequence, he refused to respond to defendants' discovery requests by asserting his fifth amendment privilege against self-incrimination. Mac-Donald filed a motion to compel discovery from defendants in 1981. Based on his intention to refuse any discovery in the case until the resolution of the criminal matter, the magistrate entered an order on September 21, 1981 denying MacDonald's motion to compel discovery and providing that "plaintiff may not proceed with any discovery herein unless and until he is prepared to respond to discovery instituted by defendants." MacDonald died before any discovery was obtained from him. Defendants now move to dismiss this case for failure of MacDonald to provide discovery, alleging that they have been irreparably prejudiced by the failure to receive discovery from him.

Several courts have concluded that a suit instituted by a civil litigant, who then refuses discovery by asserting the fifth amendment privilege, may be dismissed. *Lyons v. Johnson,* 415 F.2d 540 (9th Cir. 1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970); *Penn Communications Specialties, Inc. v. Hess,* 65 F.R.D. 510 (E.D.Pa.1975); *Wehling v. C.B.S.,* 608 F.2d 1084 (5th Cir.1979). The theory of these cases is explained generally in *Lyons:*

> Clearly, the process of discovery has become increasingly recognized as one of the primary and essential elements in making federal court business flow and in contributing to the accomplishing of trial justice or settlement termination of litigation. The scales of justice would hardly remain equal in these respects, if a party can assert a claim against another and then be able to block all discovery

attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim. If any prejudice is to come from such a situation, it must, as a matter of basic fairness in the purposes and concepts on which the right of litigation rests, be to the party asserting the claim and not to the one who has been subjected to its assertion. It is the former who has made the election to create an imbalance in the pans of the scales.

415 F.2d at 542.

Some of the cases have ordered dismissal as a sanction for failure to comply with discovery; Fed.R.Civ.P. 37; *Penn Communications Specialties, Inc.* Although defendants do not cite Rule 37 in their brief in support of this motion, the word "sanctions" is used, and this motion was filed as a cross-motion to plaintiffs' current motion to compel discovery from defendants.

The court does not view dismissal of this action as an appropriate sanction under Rule 37. Indeed, the court notes that one case cited by defendants states that dismissal of a case for failure to comply with discovery by reason of assertion of the fifth amendment privilege is not an available remedy under Rule 37.

We hold that the district court erred in concluding that plaintiff's assertion of his self-incrimination privilege during pretrial discovery automatically required the dismissal of his libel action. First, we find no provision in the federal discovery rules which authorizes a court to impose sanctions on a party who resists discovery by asserting a valid claim of privilege. *See* 8 C. Wright & A Miller, *Federal Practice and Procedure* § 2018 (1970). Rule 26 limits the scope of discovery to matter that is "not privileged." Because CBS had no right to information protected by the privilege against self-incrimination, Wehling did not violate the discovery rules when he declined to answer the questions posed at his deposition. In short, the district court had no authority to order Wehling to disclose privileged information and, consequently, should not

have imposed sanctions when Wehling declined to answer.

*Wehling,* 608 F.2d at 1087. Even the *Lyons* decision appears to have been limited to cases where the privilege is improperly invoked, a situation not presented here. *Campbell v. Gerrans,* 592 F.2d 1054 (9th Cir.1979).

Even if the court were to find that Rule 37 allows dismissal when a party exercises the fifth amendment privilege, the court would not find application of a discovery sanction appropriate in this case. The sanctions of Rule 37 are applicable for failure to comply with an order. Fed.R.Civ.P. 37(b). In some of the cases cited by defendants the sanctions were imposed only after the party disobeyed an order compelling discovery. *Lyons,* 415 F.2d at 541. In *Jones v. B.C. Christopher & Co.,* 466 F.Supp. 213, 223 (W.D.Wash.1979), the court stated that dismissal as a Rule 37 sanction would not be proper until an order compelling discovery was requested and issued. There was no order compelling discovery issued here; the order of the magistrate merely denied MacDonald's motion to compel discovery from defendants. Defendants appear to have been content to stay all discovery until after the criminal proceeding, for no order compelling discovery from MacDonald was sought or issued. Since there was no such order, MacDonald violated no court order, and the sanction of dismissal, therefore, is inappropriate.

However, the court recognizes that defendants may have been prejudiced by the inability to obtain discovery from Mr. MacDonald. The court in *Wehling* stated that the district court could order a dismissal as a remedy to prevent unfairness to the defendant, even when it was not available as a Rule 37 sanction. 608 F.2d at 1087 n. 6. The court noted that dismissal was a remedy of last resort when plaintiff's refusal to submit to discovery is based on his exercise of a constitutional right. The court indicated that dismissal should be ordered only when other less burdensome alternatives are unavailable to prevent unfairness to the defendant. The defendant must show some prejudice before any remedies are imposed.

It is possible that avenues of discovery open to CBS in 1977 will be closed by the time the stay is lifted in 1980. Should the district court determine that postponing discovery has deprived CBS of crucial information which otherwise would have been available and that the lack of such information has compromised CBS's ability to prove truth, the court would be free to fashion whatever remedy is required to prevent unfairness to defendant. However, prejudice to defendant must be established before any remedies are appropriate. *Id.* at 1089.

Similarly, the Court of Appeals for the District of Columbia circuit has adopted an approach that balances the interests of the parties to determine whether dismissal is an appropriate sanction for failure to provide discovery. *Attorney General of the United States v. The Irish People, Inc.,* 684 F.2d 928, 953 (D.C.Cir.1982).

Plaintiff refused to submit to discovery while a criminal indictment was pending against him and asserted his privilege against self-incrimination. Upon the assertion of such privilege it would not have been appropriate to dismiss the action, since plaintiff would have been deprived of the opportunity of pursuing his claim solely because he had asserted a constitutional right. *Wehling,* 608 F.2d at 1088.

Likewise, the death or disability of a plaintiff before discovery of such plaintiff does not mandate an automatic dismissal. There are many instances in which failure to have discovery of a plaintiff imposes no or limited hardship upon the defendant.

In that respect this case is no different from most cases instituted by a representative of a deceased plaintiff. The death or disability of a plaintiff which prohibits discovery of such plaintiff is seldom a proper basis for dismissing the claim. In this matter the initial disability was self-imposed but there is no valid reason why the effect should be different. This is not a case of an arbitrary refusal to submit to discovery which warrants the imposition of a dismissal. Rather the issue is whether the refusal to submit to discovery on valid grounds requires a dismissal of the underlying action.

There may be circumstances under which the inability of defendant to have discovery of the plaintiff is so prejudicial that dismissal of the complaint is the only adequate remedy. The plaintiff having died before his deposition was taken, the question remains whether the defendant is significantly prejudiced thereby so as to require the drastic remedy of dismissal.

Plaintiff MacDonald instituted this defamation action against defendants predicated upon the publication of the statement set forth above. Defendants claim they have been prejudiced by the inability to take Mr. MacDonald's deposition. They allege that they will be hampered in their attempt to prove the truth of the published statement, and in their attempt to establish precisely what damages resulted from the publication of the statement.

Defendants have asserted the truth of the statement as an affirmative defense to this action. They will bear the burden of proof of this defense.

Plaintiff, both by his complaint and through affidavit, has asserted the falsity of the statement. Certainly defendants would have the right to depose and cross-examine plaintiff and vigorously pursue the claim of falsity ascribed to the alleged defamatory statement.

Defendants do not contend, however, that plaintiff was an original and direct source of the information which formed the basis for the statement. On the contrary, defendants relied on other sources to provide the basis for its publication. Obviously defendants are not deprived of those sources by reason of plaintiff's death or by his assertion of his fifth amendment rights while alive.

If defendants have been prejudiced by the failure to have discovery, appropriate remedies may be fashioned. The prejudice to defendants, if any, may be counterbalanced to a substantial extent by permitting defendants to comment upon plaintiff's refusal and by permitting the jury to draw an

**1060**

adverse inference therefrom. *Mahne v. Mahne*, 66 N.J. 53, 62, 328 A.2d 225 (1974). This or other remedies are available to balance any prejudice sustained by defendants as the result of being deprived of discovery. Whether there has been any prejudice and what remedies should be afforded if such prejudice is established cannot be resolved at this time.

As to the issue of damages, here again, the inability to depose plaintiff may hamper defendants in their preparation and defense but not significantly enough to require a dismissal of the action at this junction. If plaintiffs intend to prove special damages, defendants will have the opportunity for pretrial discovery and cross-examination at the time of trial as to those proofs.

Defendants contend that they will be deprived of the opportunity of examining MacDonald as to the damages sustained by him by virtue of the publication of other similar statements. However, defendants will be able to submit proof and argue to the jury that the statement caused no harm to plaintiff or that it is impossible to segregate the damage caused by defendants' publication from that of other similar publications. The inability of defendants to pursue plaintiff's knowledge on this issue does not cause any substantial prejudice to defendants.

Therefore, although the court recognizes that defendants have been deprived of a valuable means of preparing and presenting their defense, the court concludes that the prejudice to defendants is not substantial and does not outweigh the right of plaintiff's successors to pursue the matter.

At this juncture, defendants have failed to demonstrate sufficient prejudice to warrant dismissal of the complaint for failure to have discovery of Mr. MacDonald. The court will consider appropriate alternative remedies in order to protect the rights of the defendants by virtue of such deprivation. Defendants are directed to move for such remedies upon the completion of all discovery.

Counsel for plaintiffs is hereby directed to submit an appropriate order in accordance with this opinion.