JAMES M. CANINO, AND KATHLEEN RAPHAEL, EXECUTRIX OF THE ESTATE OF ALVIN RAPHAEL, PLAINTIFFS-RESPONDENTS, v. NEW YORK NEWS, INC. AND DAVID HARDY, DEFENDANTS-APPELLANTS.

Argued February 6, 1984—Decided May 29, 1984.

*Louis L. D'Arminio* argued the cause for appellant New York News, Inc. (*Breslin, Herten & LePore,* attorneys).

*Kevin R. Gardner* argued the cause for appellant David Hardy (*Connell, Foley & Geiser,* attorneys).

*Warren J. Kaps* argued the cause for respondents (*Kaps & Stern,* attorneys; *Anthony P. Pasquarelli,* on the briefs).

*Peter G. Banta* argued the cause for *amicus curiae* Time Inc. (*Winne, Banta & Rizzi,* attorneys).

The opinion of the court was delivered by

O'HERN, J.

We granted this appeal to consider whether an action for libel survives the death of the defamed party. We agree with the two lower courts that the action survives and affirm.

On Sunday, October 21, 1979, the New York Daily News published an article written by its reporter David Hardy, entitled "Report corruption in housing agency." The article reported that reputed "mob-connected contractors," working in collusion with political leaders, "ripped off" millions in state housing funds. The article identified Alvin Raphael and James Canino as two such contractors.

On October 16, 1980, Raphael and Canino filed their complaint against the News and Hardy, disputing the article's statement that they were "linked by authorities" to a certain New Jersey-based crime family. They sought damages, claiming that their reputations and businesses were injured and that they had suffered humiliation and emotional distress. Defendants answered that the publication was privileged under the constitutions and laws of both New Jersey and New York, as well as under the First and Fourteenth Amendments of the United States Constitution. They pleaded truth and fair comment along with other defenses.

On January 5, 1981, Raphael died. In December 1981, Raphael's widow and executrix, Kathleen Raphael, was substituted as a party plaintiff. She filed an amended complaint in a representative capacity, seeking damages for the injury to the decedent. Kathleen Raphael asserted no individual claims.

Defendants moved in March 1982 to dismiss the amended complaint, relying primarily on the case of *Alpaugh v. Conkling*, 88 *N.J.L.* 64 (Sup.Ct.1915), which held that defamation actions were a personal right and abated at defendant's death. On May 7, 1982, the trial court denied the motion to dismiss. The court found more persuasive the decision in *Weller v. Home News Pub. Co.*, 112 *N.J.Super.* 502 (Law Div.1970), in which Judge Furman allowed a libel action to survive plaintiff's

death. The court in this case interpreted *N.J.S.A.* 2A:15–3, which allows the survival of a "trespass done to the person or property," to embrace an action for defamation. The Appellate Division in an unreported opinion affirmed the trial court on the basis of its oral opinion, adding: "We also note with approval, Judge Sarokin's opinion in *MacDonald v. Time, Inc., et al.,* 554 *F.Supp.* 1053 (D.N.J.1983)." We granted defendants' motions for leave to appeal. 95 *N.J.* 178 (1983).

The *MacDonald* case dealt with a similar claim. MacDonald had been a member of the New Jersey Casino Control Commission. The publication linked him with "Mob influence." He, too, died before trial. Defendant moved to dismiss on the ground that the cause of action abated upon his death. The District Court denied the motion:

> But if the plaintiff had a valid cause of action here, there is no just reason why it should not survive his death. To say that a man's defamed reputation dies with him is to ignore the realities of life and the bleak legacy which he leaves behind.
>
> There is no valid reason which should deny the family of Kenneth MacDonald the right to clear his name and seek compensation for its destruction. Why should a claim for a damaged leg survive one's death, where a claim for a damaged name does not. After death, the leg cannot be healed, but the reputation can. [*MacDonald*, 554 *F.Supp.* at 1054 (footnote omitted).]

In exercising its diversity jurisdiction, the court carefully reviewed New Jersey precedent to aid it in discerning what the state's highest court would do if presented with the issue. It concluded, as we do now, that the *Weller* decision represents the correct interpretation of the survival statute, and that the Legislature intended defamation actions to survive.

## I.

At common law it was said: *"actio personalis moritur cum persona"*—"a personal right of action dies with the person." It would be anomalous to breathe life into this maxim, since all agree it had no foundation in principle:

> The reason for the existence of the maxim, like the date of its origin, is the subject of considerable conjecture among legal scholars, some of whom have reached somewhat negative conclusions. Pollock characterized the rule as "one

of the least rational parts of our law," and declared that when damages recoveries came to be understood as compensatory rather than punitive in purpose, "the rule *actio personalis moritur cum persona* seems to be without plausible ground." Plucknett discloses his opinion as to the merits of the rule by observing tersely: "Our remarks about this famous brocard can happily take the form of an obituary notice." The Tennessee Supreme Court has declared that "no reason has ever been assigned for the existence of this rule which would satisfy an enlightened court of modern times." [Smedley, *Wrongful Death—Bases of the Common Law Rules*, 13 *Vand.L.Rev.* 605, 607 (1960) (footnotes omitted).]

Most agree that the rule came about because tort remedies were an adjunct to criminal penalties. If a criminal died, there could no longer be punishment; it was thought by analogy that tort claims terminated at death as well. Since the recovery of damages was viewed as a matter of personal revenge between the victim and wrongdoer, death erased the purpose of a civil action between them: "Death pays all when the criminal has gone. 'The party cannot be punished when he is dead.' And even if he survives, and it is the injured party who has died, surely it is the king and not the representatives who should take up redress." Winfield, *Death as Affecting Liability in Tort*, 29 *Colum.L.Rev.* 239, 249 (1929) (quoting F. Pollock, Law of Torts 578 (12th ed. 1923)); *see* W. Prosser, Handbook of the Law of Torts § 126, at 898 (4th ed. 1971). Review of the doctrine's origins should convince us that it bears little relevance to a modern system of justice. "[T]he question is * * * why a fortuitous event such as death should extinguish a valid action." *Id.* at 901.

In England, the common law rule was modified by statutes in 1833, 1846 (Lord Campbell's Act), and 1934. *See* discussion in *Hunt v. Authier*, 28 *Cal.*2d 288, 169 *P.*2d 913, 915 (1946) (citing Winfield, *supra*); Prosser, *supra* at 898–99. New Jersey adopted a wrongful death statute in 1848 and a survival statute in 1855. *L.*1855, *c.* 126.[1] In *Alpaugh v. Conkling, supra,* 88

---

[1] The statute provided then:

1. *BE IT ENACTED by the Senate and General Assembly of the State of New Jersey,* That executors and administrators shall and may have an

*N.J.L.* 64, the court held that the statute did not include an action for slander in the clause "trespass to person or property." It relied primarily on *Cooper v. Shore Elec. Co.*, 63 *N.J.L.* 558 (E. & A.1899), in asserting that it was "injury to property rights which gave to the suit the quality of survivorship." *Alpaugh*, 88 *N.J.L.* at 67.[2] But *Cooper* was a suit for wrongful

action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser or trespassers, and recover their damages in like manner as their testator or intestate would have had if he or she was living.

2. *And be it enacted,* That where any testator or intestate shall, in his or her lifetime, have committed any trespass to the person or property, real or personal, of any person or persons, such person or persons, his or her executors or administrators, shall have and maintain the same action against the executors or administrators of such testator or intestate as he, she, or they might have had or maintained against such testator or intestate, and shall have the like remedy and process for the damages recovered in such action as are now had and allowed in other actions against executors or administrators.

3. *And be it enacted,* That the third section of the act, to which this is a supplement, is hereby so amended, that if the plaintiff or defendant die after filing the declaration, although before issue joined, then the action shall not abate in those cases where it would not abate in case such death happened after issue joined.

The Survival Act now reads:

Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living.

In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased. [*N.J.S.A.* 2A:15–3.]

2The *Alpaugh* court also referred to distinctions between trespass and case, finding that the relevant Massachusetts statute, which spoke of "actions on the case, for damages to the person," had been held "not [to] work a survival of suits for injury to the feelings and reputation." 88 *N.J.L.* at 67 (citing *Walters v. Nettleton*, 59 *Mass.* (5 *Cush.*) 544 (1850)). Addressing a New York State Bar Association meeting in 1884 on the recent English reforms, Lord Chief Justice Coleridge of England remarked: "Special pleading finds no refuge on the habitable earth except, as I believe, in the State of New Jersey."

death, not a survival action, and in creating a wrongful death action, the Legislature limited it to the economic losses of the survivors. There is an elementary difference between the two remedies:

> New Jersey's wrongful death statute created a new cause of action "beyond that which the deceased would have had if he had survived, and based on a different principle—a new right of action." *Cooper v. Shore Electric Co.*, 63 *N.J.L.* 558, 563 (E. & A.1899); *see* 2 F. Harper & F. James, *supra* [The Law of Torts (1956) ], § 24.2 at 1286. Upon the death of a tortiously injured person, the statute provides a right to recover the pecuniary damages incurred by the decedent's next of kin as a result of the death. *See N.J.S.A.* 2A:31-4, –5 * * *. [*Alfone v. Sarno*, 87 *N.J.* 99, 107 (1981).]

Hence, in *Cooper*, the death of the intended beneficiary during the course of the wrongful death suit did not abate the action but did limit the recovery.

Such a holding is irrelevant to the question whether another cause of action that predated death should survive. Far more persuasive is Chief Justice Mercer Beasley's almost contemporaneous construction of the statute in *Ten Eyck v. Runk*, 31 *N.J.L.* 428 (Sup.Ct.1866). That case dealt with damages done by a backflow of dammed waters, an action "of course, in case." *Id.* After suit was filed, the defendant died and his executors sought dismissal. The court said:

> It is obvious that in its widest scope the word "trespass" signifies every injury to property. * * * It is obvious, therefore, that in this broad acceptation of the word, the injury * * * in the present case, was a trespass—and being such, it clearly falls within the letter of the statute. But not only this, it is, as it seems to me, just as clearly embraced in its general scope or spirit. This act is highly remedial in its character. Its intent was to relieve against the harsh injustice of the old rule—*"actio personalis moritur cum persona."* There was certainly nothing in morals, in public policy, or in good sense, to justify the continuance of a rule which grounded a man's right to recover for an injury to his person or estate, inflicted by a tortious act, on the contingency of the party injured surviving to the date of the judgment. The statute, therefore, is to be liberally construed so as to advance the remedy for this imperfection * * *. In my opinion the word "trespass," as used in the section under consideration, must be received as equivalent in meaning to the word "tort"—so that the effect of the provision is to give a right of suit against the personal representa-

---

C. Bello and A. Vanderbilt, Jersey Justice: Three Hundred Years of the New Jersey Judiciary 22 (1978).

tives of a deceased wrong-doer for any injurious act of a suable nature, without reference to the form in which the remedy must be sought. [*Id.* at 429–31.]

The *Ten Eyck* decision conforms to the way lawyers and judges of the time viewed actions for libel and slander. In *Johnson v. Shields,* 25 *N.J.L.* 116 (Sup.Ct.1855), the statement that plaintiff's actions could "send him to the penitentiary" was slander actionable *per se* as a "trespass on the case." That libel was regarded as an injury to the person is shown in *Trenton Mut. Life & Fire Ins. Co. v. Perrine,* 23 *N.J.L.* 402 (Sup.Ct.1852), in which a corporation, not being a natural person, could recover only for a libel that caused it special damages. *See also Joraleman v. Pomeroy,* 22 *N.J.L.* 271 (Sup.Ct. 1849) (action on the case for insulting description of plaintiff); *McCuen adsm. Ludlum,* 17 *N.J.L.* 12 (Sup.Ct.1839) (no special damages claim necessary to maintain action for libelous statements).

In its style and substance, *Ten Eyck* is mirrored in the later opinion of *Weller v. Home News Pub. Co., supra,* 112 *N.J.Super.* 502. In that case, Judge Furman wrote that the result in *Alpaugh*

is repressive and out of keeping with the preferable trend outside New Jersey.

\*   \*   \*   \*   \*   \*   \*   \*

The term "trespass" in the statute is equated with "tort." It should not be modified by implication to exclude torts in which damages for emotional distress, not physical injury, are sought. Any such distinction is arbitrary. [*Id.* at 505–06.]

These courts recognized that libel or slander, an injury to a person, quite apart from economic loss, was a trespass or, as it was known then and now, a tort. We are satisfied that the clause "trespass to the person" in the Survival Act, *N.J.S.A.* 2A:15–3, was meant to include tort actions for libel and slander.[3]

---

[3]An issue was raised at oral argument as to whether defamation of a deceased person gives rise to a cause of action in favor of the surviving relatives who have not been defamed. In New Jersey, one commentator has argued that defamation of a deceased person should be dealt with by the legislature. Gottschalk, *When the Dead are Defamed ... Law in Evolution,* 99

## II.

We are urged, however, not to view the statute as of that time, but rather in light of our developing law of libel and slander. *Cf. Renz v. Penn Central Corp.*, 87 *N.J.* 437, 458 (1981) (to remain meaningful, a statute should be construed to preserve a "sensible place in the contemporary scene"). In *Kotlikoff v. The Community News*, 89 *N.J.* 62, 73 (1982), we emphasized that the "pace and structure" of modern life are such that the free expression of opinion on public affairs is essential to uninhibited debate in the community. Concern for these principles requires our careful consideration, as does the fact that "[a]n action for defamation abates on the plaintiff's death in the vast majority of States." *Robertson v. Wegmann*, 436 *U.S.* 584, 591 n. 6, 98 *S.Ct.* 1991, 1995 n. 6, 56 *L.Ed.*2d 554, 562 n. 6 (1978). Many states have expressly provided by exception to their survival acts that defamation actions will not survive. *See, e.g., Ariz.Rev.Stat. Ann.* § 14–3110 (1981); *Ill. Rev.Stat.* ch. 110½, § 27–6 (1976); *Md.Cts. & Jud.Proc.Code Ann.* § 6–401(a) (1974). There are arguably sound reasons for such a view, although Pennsylvania has found the distinction so repugnant that it has declared the statute unconstitutional. *Moyer v. Phillips*, 462 *Pa.* 395, 341 *A.*2d 441 (1975) (right to protect reputation included under state constitution's equal protection provision; libel and slander actions cannot be excepted from survival act). "But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in * * * debate on public issues." *Gertz v. Welch*, 418 *U.S.* 323, 340, 94 *S.Ct.* 2997, 3007, 41 *L.Ed.*2d 789, 805 (1974). And as Justice Stewart has written, the individual's right to protect his or her reputation "reflects no more than our basic concept of the

*N.J.Law.* 10, 14 (Spring 1982). The issue is not before us since in this case and in *MacDonald* both plaintiffs were living at the time of publication.

essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 *U.S.* 75, 92, 86 *S.Ct.* 669, 679, 15 *L.Ed.*2d 597, 609 (1966) (Stewart, J., concurring).

On balance, then, we do not believe that the principles that underlie our free speech decisions are present here. The central goal of these decisions is to guarantee the freedom of the press to inform a self-governing people. In *Kotlikoff,* we emphasized that the result was driven by our " 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' " 89 *N.J.* at 73 (quoting *New York Times v. Sullivan*, 376 *U.S.* 254, 270, 84 *S.Ct.* 710, 720, 11 *L.Ed.*2d 686, 701 (1964)). In *Maressa v. New Jersey Monthly*, 89 *N.J.* 176, 200, *cert.* denied, 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982), we said: "Our Constitution grants the press wide freedom because we believe that the public interest is served by an informed citizenry. Those responsible for informing the public can discharge their function best when they can publish without anyone looking over their shoulders."

Thus, in First Amendment cases, our primary concern has been the free dissemination of ideas. That concern is not implicated here. Once the statement is published, the rights of the parties are fixed for good or ill; the plaintiff's death thereafter cannot affect the fact of publication and libel. There may be some difficulty in evaluating the injury to the deceased plaintiff, but that appears to be no more or less difficult than determining the pain and suffering of a personal injury victim who subsequently dies. Indeed, had the reporter died, there would be evidentiary difficulties as well. We cannot foresee any behavorial influence on a free press that the contrary rule would achieve. Can anyone imagine an editor so hard-bitten as

to weigh the words the less in contemplation of another's death?  We think not.

Although there is a tendency to view the issues here and in *MacDonald* in the context of media defendants, the principles and considerations relied upon to determine whether a cause of action for defamation survives the death of a plaintiff do not implicate the First Amendment freedoms and values that become involved in the resolution of the underlying cause of action against a media defendant.   "[T]he potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits." *Calder v. Jones,* —— *U.S.* ——, ——, 104 *S.Ct.* 1482, 1487, 79 *L.Ed.*2d 804, 813 (1984) (choice of forum issues determined by minimum contacts).

Because at common law an action for libel or slander was considered a trespass to the person under *N.J.S.A.* 2A:15–3, the action survives the death of the person claiming injury.  We are satisfied that survival of such an action for defamation is more in accord with our values and will not conflict with the guarantees of First Amendment freedoms set forth in *Kotlikoff, Maressa,* and *Lawrence v. Bauer Pub. & Printing Ltd.,* 89 *N.J.* 451, *cert.* denied, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982).

The judgment below is affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.