Shirley J. INNES, Executrix of the Estate of John J. Innes, Plaintiff–Appellant,

v.

HOWELL CORPORATION; Lake Coal Company, Inc.; Paul N. Howell; Steven K. Howell; Forrest E. Cook; Cook, Wright & Taylor, Defendants–Appellees.

No. 94–5827.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 20, 1995.

Decided Feb. 16, 1996.

Charles W. Kenrick (argued), Dickie, McCamey & Chilcote, Pittsburgh, PA, for Innes.

Forrest E. Cook, Cook, Wright & Taylor, Whitesburg, KY, Ronald L. Green (argued), Boehl, Stopher & Graves, Lexington, KY, for Forrest E. Cook, Cook, Wright & Taylor.

Stephen E. Embry, Brown, Todd & Heyburn, Louisville, KY, Keith Moorman, Brown, Todd & Heyburn, Lexington, KY, Eugene B. Wilshire, Jr. (argued), Wilshire & Scott, Houston, TX, for Howell Corp., Lake Coal Co., Inc., Paul N. Howell, Steven K. Howell.

Before: KRUPANSKY, BATCHELDER, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which KRUPANSKY, J., joined. BATCHELDER, J. (p. 716), delivered a separate concurring opinion.

MOORE, Circuit Judge.

John Innes was fired as President of Lake Coal Company, Inc. ("Lake Coal"), after it was discovered that he had personally received payments from an independent contractor of Lake Coal. Officers of Howell Corporation, Lake Coal's parent, alleged that Innes had received "kickbacks." Innes claimed that these were "consulting fees," for which he had received express consent from Howell Corporation. Each side filed suit against the other—Howell Corporation for breach of fiduciary duty, Innes for wrongful discharge. After seven years of litigation culminating in a jury trial, judgment was

entered in favor of Howell Corporation. Innes's executrix now appeals several of the district court's rulings relating to discovery, witness testimony, jury instructions, and the constitutionality of Kentucky's survival statute. For the reasons that follow, we affirm in all respects.

## I. BACKGROUND

From 1978 to 1986, John Innes was the vice-president of Howell Corporation and president of Lake Coal, Howell Corporation's subsidiary. Toward the end of this period, a transaction took place between Lake Coal and one of its independent contractors, Bright Coal Company ("Bright Coal"), in which Lake Coal was to receive some of Bright Coal's real property in exchange for relieving Bright Coal of its substantial debts (the "Big Branch transaction"). Innes played a key role in this deal, which allowed ailing Bright Coal to remain solvent. In addition, Innes assisted one of Bright Coal's principals, Jim Hogg, in setting up a new company called Commerce Coal, which would continue to perform mining services for Lake Coal after the Big Branch transaction was completed. All parties agree that Innes's efforts saved Bright Coal from bankruptcy. In return for Innes's assistance, Jim Hogg arranged for Commerce Coal to pay Innes $100,000 in numerous installments.

According to defendants, when Steven Howell, president of Howell Corporation, learned of these payments—through investigations by Forrest Cook, Lake Coal's counsel—he confronted Innes with the information, and Innes admitted to everything. Steven Howell fired Innes, stating that receipt of the payments evinced a blatant conflict of interest. Innes, on the other hand, argues that Paul Howell, the chair of Howell Corporation and Steven Howell's father, affirmatively consented to Innes's receipt of these "consulting fees" while the two were vacationing together in Jamaica. Innes's employment at Howell Corporation and Lake Coal was on an at-will basis, and so his claim is based on the theory that Paul Howell's assurances orally modified his employment agreement with the companies. Paul

Howell denies that any such oral modification was ever given.

Howell Corporation and Lake Coal first sued Innes in the Southern District of Texas, alleging civil RICO violations, civil conspiracy, and a breach of fiduciary duty. Jurisdiction was founded on diversity of citizenship. Innes responded with numerous counterclaims in Texas and then filed his own action in the Eastern District of Kentucky, raising even more claims against Howell Corporation, Paul Howell, Steven Howell, Lake Coal, Forrest Cook, Cook's law firm, and other individuals as well. The cases were consolidated in Pikeville, Kentucky in 1988, and then extensive discovery took place over five years.

In 1992, the magistrate judge in Pikeville issued his proposed findings of fact and recommendation in response to motions on both sides for summary judgment. He recommended granting summary judgment on most of the claims and counterclaims, which pared the complaints on both sides to just a few issues. After objections were filed, the district judge accepted the bulk of the magistrate judge's recommendations, rejected a few, and then in August set final pretrial deadlines. One of the deadlines was for discovery to be completed by October 15, 1993. Another was for submission of exhibit lists, witness lists, pretrial memoranda, and proposed jury instructions to the court on December 27, 1993, one week before the final pretrial conference.

The defendants-appellees fall into two groups: the Howells (Howell Corporation, Paul Howell, Steven Howell, and Lake Coal) and Cook (Forrest Cook and his law firm, Cook, Wright & Taylor). Innes had brought a legal malpractice claim against Cook, alleging that Cook's investigations of Innes constituted a conflict of interest, and Cook therefore spent much of the second half of 1993 attempting to discover the names of Innes's prospective expert witnesses and the substance of their testimony. In response to Cook's interrogatories, Innes stated that the request for information regarding expert witnesses was "premature," and that he would not have to respond until December 27, 1993, the date set by the district court for the

submission of witness lists. Cook filed a motion to compel answers on October 15, 1993, the discovery deadline, and the district court granted the motion, ordering that Innes answer by October 22. Innes did finally respond to the new deadline, naming two potential experts, but his answers did not give any indication of the opinions his experts would give, as required by Rule 26 of the Federal Rules of Civil Procedure. Moreover, Innes appended a short caveat at the end of his response:

> John J. Innes reserves the right to supplement these interrogatory responses up to the time of trial. In this regard, Mr. Innes may be adding the names of additional lay and expert witnesses and may be expanding the content and scope of designated expert testimony. This testimony will likely include the name of a law professor and/or practicing attorney who has expertise in the Code of Professional Responsibility and other legal standards that apply to Forrest Cook's conduct in this case.

Cook filed a motion to strike, "or alternatively, to limit experts," on November 3, 1993. On November 30, before the trial court had ruled on the motion, Cook also moved for summary judgment, arguing that Cook had not been Innes's attorney, and that Innes had not produced any expert to counter Cook's expert's opinions. At this point, trial was still set for January 1994, and Cook had not yet been furnished with any information regarding Innes's legal malpractice experts. At the last minute, Innes responded to Cook's motion on December 16, 1993 by producing a law professor, John Burkoff, who rebutted Cook's evidence in an affidavit. This was enough to create a genuine issue of material fact for the district court, and the summary judgment motion was denied.

A snowstorm resulted in postponement of the jury trial to May 9, 1994. Three weeks before that, on April 18, Cook reminded the district court at a pretrial conference that the motion to strike had still not been ruled upon. After hearing arguments by the parties, the court sustained the motion, striking Innes's "additional expert," John Burkoff.

Plaintiff filed a motion for reconsideration, which was denied.

During the postponement of the jury trial, John Innes died, and his wife Shirley took over as plaintiff on behalf of his estate. On the first official day of trial, the district court granted summary judgment in favor of the Howells on Innes's slander per se claim, citing KRS § 411.140's provision that slander and libel claims do not survive the death of a party. Ky.Rev.Stat.Ann. § 411.140 (Baldwin 1991). Plaintiff Shirley Innes objected that KRS § 411.140 was unconstitutional, but the district court rejected this argument.

Before trial, the district court had also made other rulings regarding the evidence to be presented. The court decided that testimony regarding Innes's psychological condition would be excluded, even though plaintiff protested that it was necessary to show the extent of tort damages. The court ruled instead that plaintiff's claim was essentially "a breach of contract action," and so psychological testimony would be irrelevant. In addition, the court excluded the testimony of Innes's "headhunter"/"psychologist," Michael Moran, regarding allegedly slanderous statements made by Steven Howell to Moran. Innes had originally tried to introduce this testimony to support the slander claim. The court found that the evidence was no longer germane to the issues at trial.

At the conclusion of the evidence, the district court entertained objections to its proposed jury instructions. Two of plaintiff's objections are relevant to this appeal: first, plaintiff objected to the instruction that in order for the jury to find for plaintiff, it would need to decide that John Innes "fully disclosed" the "nature and extent" of his consulting services to Paul Howell. Second, plaintiff objected to the instruction that in order to prevail on the breach of contract claim, the jury would have to find that the Howells fired John Innes "solely because" of his receipt of consulting fees. The district court overruled both objections, and the jury rendered a verdict completely favorable to defendants, finding that Cook did not act as Innes's attorney, that Paul Howell had never consented to Innes's "consulting fee" arrangement, and that Innes breached his fidu-

ciary duties to Lake Coal and Howell Corporation.

## II. SURVIVAL OF THE SLANDER CLAIM

■ Plaintiff's most plausible argument on appeal is that the district judge incorrectly granted summary judgment on her claim of slander per se, because KRS § 411.140's prohibition on the survival of slander actions is a violation of equal protection. Section 411.140 provides that all rights of action "for personal injury or for injury to real or personal property" shall survive the death of either party, "except actions for slander, libel, criminal conversation, and so much of the action for malicious prosecution as is intended to recover for the personal injury." Ky.Rev. Stat.Ann. § 411.140 (Baldwin 1991). According to plaintiff, the statute creates two classes of individuals: "The first class is composed of all parties who suffer legal injuries other than those to reputation. The second class is composed of those persons who suffer legal injury to reputation." *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441, 443 (1975). Plaintiff argues that there is no rational basis for allowing the actions of individuals in the first class to survive the death of a party while disallowing the same for individuals in the second class.[1]

■ In this type of equal protection challenge, the statute is upheld upon a determination that the classification is "rationally related to a legitimate governmental interest." *Curto v. City of Harper Woods,* 954 F.2d 1237, 1244 (6th Cir.1992) (per curiam). Because plaintiff bears the burden of demonstrating that no rational basis exists for the statute, any conceivable basis is sufficient to sustain it, even if there is no indication that the suggested rationale actually motivated the legislature in enacting it. *See United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461–62, 66 L.Ed.2d 368 (1980). Finding such a basis here, though, is not as easy as it might first ap-

pear. The Howells argue that the distinction for slander is justified because slander involves injury to reputation, and the need to protect reputation is reduced once the person is dead. Even if we accept this assertion, however, nothing appears to distinguish slander from other kinds of torts involving bodily injury or emotional distress once the claimant has died. A tort of battery involves injury to the body; the tort of outrage involves injury to the mind. It can be stated with at least equal force that the need to protect the body or the mind diminishes once the person is dead. Indeed, one would suppose that unlike body or mind, a person's reputation outlives her, and the need to protect it is *greater* than the need to protect the more tangible parts of a person after she dies. In addition, a slander action, like many tort actions, can involve both pecuniary and non-pecuniary damages. There is no logical reason to believe that these damages are any less compensable once the person is dead than damages for virtually every other tort once the person is dead.

The Howells also argue that slander and libel actions present special evidentiary problems that loom larger when one of the parties, especially the original plaintiff, dies. Again, there is no rational distinction that can be made for slander on this basis. The Howells state, "The primary defense [to slander], truth, can often be proven only after a careful, thorough cross-examination of the plaintiff." Even if this is true, the Howells fail to articulate why the rule should be different for slander than for other torts where a careful cross-examination may yield the defense. For example, one of the key elements of a fraud action is the state of mind of the victim, for which affirmative or adverse proof will often only be available through the victim's testimony. *See Faircloth v. Finesod,* 938 F.2d 513, 517 (4th Cir. 1991). Quite plainly, this presents a much stronger case than slander for disallowing the claim after the victim/plaintiff has died. The problems of proof after a party has died

---

1. We should note that we do not address here that portion of the statute relating to criminal conversation or malicious prosecution. In addition, we deal only with the abatement of actions where the parties are both alive when the suit is

brought, but then one party dies while it is pending. We do not deal with the separate problem where one of the parties has suffered injury, but no suit is brought until *after* he or she is dead.

are no greater for slander actions than for many other kinds of tort actions. Even as a *category* of claim, it seems evident that those claims involving the state of mind of a party will uniformly pose greater evidentiary problems after the party's death than claims involving slander. While it might be true that greater evidentiary problems will often arise upon the death of a party, these concerns are not unique to defamation torts and cannot be a rational basis for the statutory distinction.

Only one case has directly confronted the issue. In *Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (1975), the Supreme Court of Pennsylvania held that the state statute prohibiting the survival of libel and slander actions (upon the death of either the plaintiff or defendant) was unconstitutional on equal protection grounds. Applying a rational basis test, the court deemed the differentiation of libel and slander claims "arbitrary" and invalidated it under both the Pennsylvania and U.S. Constitutions. *Id.* at 341 A.2d at 443–45. Although *Moyer* is the only decision we have found that invalidates a survival statute's exception for libel and slander, no case exists in which a court has *upheld* such a statutory exception in the face of a constitutional challenge. In addition, a few courts have relied on reasoning similar to *Moyer* to interpret a state statute to allow survivability. *See, e.g., Canino v. New York News, Inc.,* 96 N.J. 189, 475 A.2d 528 (1984); *MacDonald v. Time, Inc.,* 554 F.Supp. 1053 (D.N.J.1983). Finally, the few commentators who have discussed the subject have also looked upon the *Moyer* opinion with approval. *See* Florence Frances Cameron, Note, *Defamation Survivability and the Demise of the Antiquated "Actio Personalis" Doctrine,* 85 Colum.L.Rev. 1833, 1839 (1985); Joseph C. Chapelle & Karen L. Sterchi, Note, *Tort Law—Canino v. New York News, Inc.: New Jersey Permits Defamation Action to Survive,* 60 Notre Dame L.Rev. 165, 171–72 (1984). According to the Cameron note, the idea that slander and libel actions should not survive is based on the common law doctrine of "actio personalis," under which all tort actions originally abated upon the death of a party. Gradually, legislatures began to allow various torts to survive through the enactment of survival statutes, until the only torts

that were still non-surviving were torts like slander, libel, and invasion of privacy. 85 Colum.L.Rev. at 1834–37. Cameron argues that allowing this distinction to linger is irrational and "indefensible," and based merely on outmoded doctrines such as "actio personalis." *Id.* at 1839. Chapelle and Sterchi agree.

Notwithstanding these reservations as to the reasoning behind the statute, we nonetheless hold that KRS § 411.140 is rationally related to a legitimate government interest, at least as it pertains to slander and libel. The Howells point out that because slander and libel torts impinge upon rights of free speech, the legislature may have made a rational decision to give greater weight to the constitutional right once one of the parties has died. Ever since *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court has recognized a tension between protection of reputation and protection of freedom of expression. Of course, the tension is strongest when there is a media defendant, the subject matter is one of public interest, and the plaintiff is either a public official or a public figure. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). This case does not come close to implicating such weighty concerns. Nevertheless, it is clear that even where a purely private matter between private parties is at issue, the defendant's freedom of expression is still implicated, and the First Amendment still affords some, though less substantial, protections. *See Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (describing "an employee's false criticism of his employer on grounds not of public concern" as an example of less important but still-protected speech), *cited with approval in Dun & Bradstreet,* 472 U.S. at 760, 105 S.Ct. at 2945–46. Of course, we are not suggesting that a nonsurvivorship exception for defamation torts could in any way be *required* by the First Amendment. However, in retaining the exception, the Commonwealth of Kentucky could have found a legitimate government

interest in giving *additional* protection to freedom of expression. It could have decided that, all other things being equal, once the plaintiff in a slander action dies, his or her interest in continuing the suit is diminished just enough to tip the balance in favor of the principles of the First Amendment.

More generally, the Commonwealth could have decided that the balance is tipped once *either* party dies, because of the greater evidentiary difficulties that arise when one of the original parties is no longer around to defend or prosecute a claim. As we noted earlier, the evidentiary problems arising upon the death of a party should be no greater for defamation torts than for many other torts and cannot *of themselves* constitute a rational basis. When coupled with the government's especial solicitude for freedom of expression in the defamation context, however, the desire to protect defendants from the additional litigation burden resulting from a party's death *is* sufficient to sustain a non-survival exception. There can be no doubt that defamation litigation will often be rendered more difficult or costly for defendants upon the death of either party. As the Howells point out, a cross-examination of a plaintiff may sometimes yield the defense of truth. Just as important, the testimony of an original defendant can be critical to a defense of good faith, where "malice" is alleged. Even when "malice" is not an issue, the defense's contention that a slanderous statement was never made may nonetheless hinge upon the credibility of the alleged slanderer. In order to provide greater protection to the First Amendment rights of defamation defendants and to relieve them from the specter of such additional burdens, we hold that the state legislature could, consistent with the Equal Protection Clause, retain the exception for slander and libel contained in KRS § 411.140.

■ The First Amendment rationale for disallowing the survival of defamation actions has been roundly criticized by courts and commentators, who doubt that any real diminution of "chilling effect" is brought about by such an exception. *See Canino,* 475 A.2d at 533; *MacDonald,* 554 F.Supp. at 1054; Cameron, Note, *supra,* 85 Colum.L.Rev. at 1846.

Our function, however, is not to determine whether we as legislators would ourselves adopt such a rationale in enacting the exception, or to second-guess a state legislature's judgment as to its efficacy. Our only function is to determine whether there can be a "legitimate governmental interest" in providing extra protection for freedom of expression, and whether Kentucky's survival exception is "rationally related" to providing this protection. Although we would find reason to pause if there were in fact no possible reduction in "chilling effect" accruing from a non-survival exception, we cannot agree that any reduction is entirely "inconceivable." *Contra MacDonald,* 554 F.Supp. at 1054. In the press context, the inquiry is not whether "a newspaper would hesitate to publish a story" as a result of the foreseeable death of the story's subject or its reporter, *contra id.,* but rather whether the newspaper might modify its conduct in any imaginable way— e.g., by altering a story, delaying its publication, or requiring unusually thorough and corroborating research—in light of the potentially increased litigation burdens imposed by the foreseeable death of a party. It is not difficult to imagine situations where both a death and its significance to a lawsuit may be foreseeable—where, for instance, the story's subject is a death-row inmate, or where the newspaper editor lacks access to a front-line (or ailing) reporter's confidential sources and such access would be crucial to verifying the accuracy of the reporter's story. To say that the increased difficulties of defending defamation suits could not *conceivably* enter the minds of potential defendants and have any possible effect on their behavior is to overstate the case. In the absence of any persuasive evidence to the contrary, we must defer to the judgment of the Kentucky legislature in choosing to retain its non-survival exception.

Admittedly, the foregoing analysis may be the slenderest of reeds upon which to rest the validity of a statute. There can be little doubt that the non-survival exception for slander and libel claims is anachronistic and based on scant logic. Moreover, the record is devoid of any indication that the Kentucky legislature even considered the First Amendment rationale for retaining the exception.

Nevertheless, we reiterate that we are not called upon to decide the more reasonable policy or to give an ambiguous statute its better interpretation, and in this type of equal protection challenge, the question of whether the rationale actually "underlay the legislative decision" is "constitutionally irrelevant." *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461–62, 66 L.Ed.2d 368 (1980). The terms of KRS § 411.140 are clear. Our only role is to determine whether they violate the Constitution. They do not, because they are supported by a rational basis that involves the delicate balance between freedom of expression and the protection of reputation. Accordingly, we conclude that summary judgment was properly granted on plaintiff's slander claim.

## III. EXPERT TESTIMONY ON LEGAL MALPRACTICE

■ Plaintiff next argues that the district court's sanction for failure to comply with discovery procedures—the exclusion of plaintiff's key expert witness on legal malpractice—was an abuse of discretion. This claim must fail, however, because it cannot be shown that the expert's testimony would have had any effect on the outcome of the trial. In other words, we need not decide whether the district court's discovery sanction was an abuse of discretion, because it would nonetheless have been harmless error under Fed.R.Civ.P. 61.

■ Plaintiff's legal malpractice claim centers around the fact that Forrest Cook, Lake Coal's corporate counsel, investigated Innes and informed the Howells about Innes's "consulting fee" arrangement with Jim Hogg. Plaintiff claims that this was a breach of the attorney's duties to his client. In order for plaintiff to prevail on this claim, however, she first had to prove at trial that Cook was Innes's lawyer, *Daugherty v. Runner,* 581 S.W.2d 12, 16 (Ky.Ct.App.1979),[2] and she completely failed to meet this burden. At trial, the jury's verdict explicitly found that Cook did not represent Innes in Innes's indi-

vidual capacity. Unless plaintiff can now show that the exclusion of John Burkoff should have made a difference in this verdict, we must affirm. Fed.R.Civ.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). She cannot do so.

■ Plaintiff cannot argue that Burkoff's testimony was relevant in any way to the question of whether Cook represented Innes. Although it is true that courts have uniformly recognized either the admissibility or necessity of expert testimony in legal malpractice actions, *see Stiver v. Parker,* 975 F.2d 261, 273 (6th Cir.1992) (applying Michigan law); *Hirschberger v. Silverman,* 80 Ohio App.3d 532, 609 N.E.2d 1301, 1304–05 (1992); *Lazy Seven Coal Sales, Inc. v. Stone & Hinds, P.C.,* 813 S.W.2d 400, 406 (Tenn. 1991); Michael A. DiSabatino, Annotation, *Admissibility and Necessity of Expert Evidence as to Standards of Practice and Negligence in Malpractice Action Against Attorney,* 14 A.L.R.4th 170 (1982 & Supp.1995), there is no authority to support plaintiff's contention that expert testimony is necessary to prove the *existence* of an attorney-client relationship. The case law makes clear that the purpose of expert testimony is to guide the jury as to the relevant standard of care in the profession, based on rules and codes of professional responsibility. *See Stiver,* 975 F.2d at 273; *Lazy Seven Coal Sales,* 813 S.W.2d at 405–06; DiSabatino, *supra,* 294 N.W.2d 912, 14 A.L.R.4th at 173–85. The expert explains what the attorney's duties were to his client and what might constitute a breach of that duty. In other words, much like an expert in a medical malpractice case, the witness helps the jury understand a special professional standard of care that is different from the "reasonable person" standard used in ordinary negligence cases. All of this necessarily occurs after it is settled that an existing lawyer-client relationship is in place. The expert witness does not testify as to whether the relationship has already been formed. Under Kentucky law, that is a simple question of contract formation. The

2. Lake Coal is a Kentucky corporation and Forrest Cook is a Kentucky lawyer. Therefore, Kentucky law governs the attorney-client relationship between Cook, Lake Coal, and Lake Coal's individual officers.

*Daugherty* court explains: "The relationship of attorney-client is a contractual one, either expressed or implied by the conduct of the parties." 581 S.W.2d at 16. Thus, the existence of the relationship hinges upon the fact of mutual assent, either explicit or tacit, and not on the special ethical rules that govern in a unique negligence regime. The latter is a proper subject for expert opinion; the former is not. *Cf.* Charles M. Leibson, *Legal Malpractice Cases: Special Problems in Identifying Issues of Law and Fact and in the Use of Expert Testimony,* 75 Ky.L.J. 1, 4 (1986) (where Justice Leibson of the Kentucky Supreme Court writes: "The function of an expert witness is to provide specialized knowledge to assist the jury in understanding a factual issue which it must decide.... The role of the expert witness in a litigation negligence action should be limited to presenting evidence relating to the defendant attorney's conduct; did the attorney's conduct conform to the legal standard required under the circumstances?"). A jury does not need an expert to tell it whether there has been mutual assent for a contract. Indeed, it would truly be unfortunate if specialized legal knowledge were required for reasonable laypersons to ascertain whether they are actually being represented by counsel.

 This is true even in a situation like the one here, where the president of a corporation argues that counsel, retained by the corporation for a certain matter, was also his personal counsel on that same matter. Plaintiff contends that because Innes was named as a defendant in an environmental proceeding against Lake Coal, Cook must have represented him as well as Lake Coal in that proceeding. This is incorrect. The law is generally settled that an attorney for a corporation does not automatically represent the corporation's constituents in their individual capacities, even on the same matters. There must be clear consent. *See Restatement (Third) of Law Governing Lawyers* § 212(2) cmt. e (Tentative Draft No. 4, 1991); *Model Rules of Professional Conduct* Rule 1.13; *Model Code of Professional Responsibility* EC 5–18.[3] *See also In re Grand Jury Proceedings, Detroit, Michigan, August,*

*1977,* 570 F.2d 562 (6th Cir.1978) (per curiam) (in the absence of any evidence of personal representation, vice president has no right to assert attorney-client privilege waived by the corporation). In *Lane v. Chowning,* 610 F.2d 1385 (8th Cir.1979), the court of appeals, applying Arkansas law, held that a bank's attorneys owed no individual duty to the bank's CEO absent affirmative proof of personal representation. Without explicit consent, the court noted that "[t]he only way in which [the CEO] could have substantiated his claims against the attorneys is to have offered proof that [they] contemporaneously performed services for him, personally." *Id.* at 1389. This would have established an implicit attorney-client relationship. If no such relationship existed, the lawyers would have had no "ethical obligation to refrain from participating in [the CEO's] removal." *Id.*

Such a factual scenario is quite similar to what actually happened in Innes's case. Cook "participated" in Innes's removal by reporting his receipt of payments to Steven Howell. Unless plaintiff could somehow have demonstrated an express or implied agreement with Cook, by words or conduct, Cook would have had no ethical obligation to refrain from reporting him. (In fact, Cook's obligations to Lake Coal would presumably have *required* him to report Innes.) Simply the fact that Innes might have been subject to personal liability in the ongoing environmental litigation does not establish any legal relationship—Cook would have needed to take action on Innes's personal behalf, not just action for the general good of the corporation. As the jury plainly found, no express or implied agreement existed between Innes and Cook. Because the jury found no attorney-client relationship, plaintiff's malpractice claim cannot stand, and the exclusion of expert testimony on legal standards of care was at most harmless error.

## IV. STEVEN HOWELL'S ALLEGED HOSTILITY, BIAS, AND LACK OF CREDIBILITY

 Plaintiff also claims that the district court improperly excluded testimony of Dr.

---

**3.** At the time of the conduct at issue, Kentucky followed the *Model Code of Professional Responsibility.* The Kentucky Supreme Court has since

adopted the *Model Rules of Professional Conduct. See Oliver v. Board of Governors,* 779 S.W.2d 212, 214 (Ky.1989).

Michael Moran, Innes's "psychologist" and job-recruiting "headhunter," which would tend to show Steven Howell's bias and hostility against Innes, and therefore "reflect on [Howell's] credibility." According to plaintiff, Moran would have testified that when he telephoned Steven Howell (in his "headhunter" capacity), Howell "lashed out" at Innes, "calling him a bribe-taker, a felon and a sweet-talker who almost bankrupted Lake Coal Company." Plaintiff believes that such testimony would have been relevant to the question of "whether Steven Howell fired Mr. Innes for engaging in a conflict of interest, or whether he actually fired Mr. Innes because he simply hated him and the way he ran Lake Coal."

What plaintiff fails to realize, however, is that she still has no claim even if Steven Howell fired Innes because he "hated him and the way he ran Lake Coal." Plaintiff has no claim because Innes was an at-will employee of Lake Coal and Howell Corporation, and the president of Howell Corporation, Steven Howell, could have fired him anytime Howell was dissatisfied. *See Firestone Textile Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky.1983) (at-will employee may "ordinarily" be discharged at any time "for good cause, for no cause, or for a cause that some might view as morally indefensible"). The only reason the Howells are even subject to suit here is that Innes claimed there was an oral agreement regarding consulting fees that modified his at-will status, and that they fired him based on these consulting fees. Testimony relating to Steven Howell's bias, hostility, and lack of credibility is completely irrelevant to this claim. Plaintiff does not allege that Steven Howell knew anything about the purported agreement in Jamaica. Therefore, it does not matter how biased, hostile, or blatantly dishonest Steven Howell might have been. Plaintiff only has a claim if she shows that Innes had obtained oral assurances from Paul Howell and that Innes was fired in contravention of those oral assurances. The district court did not commit any error in excluding Moran's testimony.

## V. INNES'S PSYCHOLOGICAL TESTIMONY

■ Plaintiff contends that the trial court erred in excluding testimony by Innes's two psychologists, Dr. Paul Bernstein and Dr. Michael Moran, pertaining to the "mental anguish" Innes suffered "as a result of Howell's tortious conduct in breaching Innes' implied/oral employment contract." The trial court excluded such testimony on the ground that plaintiff's cause of action was based on breach of contract and not tort law. Plaintiff now argues that the court misconstrued Kentucky law and should have realized that tortious conduct in breaching a contract would have allowed plaintiff to claim pain and suffering damages and punitive damages on behalf of Innes. Therefore, according to plaintiff, the testimony should have been admitted.

Although it is true that Kentucky law permits a breach of contract action to yield tort damages when the breach involved "outrageous conduct," *Audiovox Corp. v. Moody*, 737 S.W.2d 468, 469–71 (Ky.Ct.App.1987), there is no way for plaintiff to make that claim on this appeal. The jury found that no oral agreement ever existed between Paul Howell and Innes—that Howell never "assured John J. Innes that he could perform consulting services for Jim Hogg and/or Commerce Coal Company and receive fees for such services." Jury Interrogatory No. 1. Because of this finding, plaintiff cannot now argue that witnesses to further his tortious breach claim should have been allowed. If no contract was found, there could be no breach; if there could be no breach, it could not have been tortious, and the testimony of Innes's psychologists is rendered irrelevant.

■ The *Audiovox* court also points out that an action for tortious breach could be brought even if there was no oral contract and plaintiff's employment was purely on an at-will basis. However, plaintiff would have to show that Innes was fired "for [his] failure to violate the law or for [his] exercise of a statutorily conferred right." 737 S.W.2d at 471. Plaintiff has not made any such allegation.

## VI. THE JURY INSTRUCTIONS

■ Plaintiff's final assignment of error relates to two of the jury instructions at

trial. The standard of review for jury instructions is that they are "reviewed as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." *Beard v. Norwegian Caribbean Lines,* 900 F.2d 71, 72 (6th Cir. 1990). The district court "may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* at 72–73.

### A. *"Solely Because"*

■ The District Court instructed the jurors on plaintiff's oral/implied contract claim that in order for plaintiff to prevail, they would have to find that the Howells fired Innes "solely because" of his receipt of consulting fees from Commerce Coal. Plaintiff argues that this instruction was incorrect because it meant that she could not prevail if the Howells fired Innes not *only* because of the consulting payments, but also for any additional reason—e.g., because they "hated him."

Plaintiff's argument must fail, because the question of the Howells' reasons for firing Innes becomes relevant only if an oral agreement actually existed in the first place. The "solely because" instruction describes what action would constitute breach of an oral employment agreement. Since the jury found that there was no agreement at all, even if the Howells did fire Innes "solely because" of the consulting payments, plaintiff has no grounds for appeal. Plaintiff cannot prove a breach where no agreement existed.

### B. *"Fully Disclosed"*

■ Plaintiff also challenges the instruction that in order to find for her, the jury had to believe that Innes "fully disclosed the nature and extent" of the consulting payments to Paul Howell. Plaintiff argues that this "full disclosure" requirement is unsupported by Kentucky law and sets an impossible standard to meet. Once again, plaintiff's contentions are without merit.

First, it is evident that the jury's verdict essentially neutralizes plaintiff's argument. According to the jury, no verbal assurances were ever given by Paul Howell regarding the consulting payments; consequently, it does not matter whether Innes "fully disclosed" to him or not. Innes breached his fiduciary duties by receiving payments from a contractor without his corporation's consent. Without consent, there could be no oral contract.

■ Nevertheless, plaintiff argues that the jury instruction and Jury Interrogatory No. 1 confused the jury into thinking that they could not find any assurances by Paul Howell regarding the consulting payments unless they first found that Innes "fully disclosed." This hypothesis is unsupported by a fair reading of the instruction and interrogatory. The instruction delivered by the district court states:

Under Kentucky law, unless there is an employment agreement to the contrary, employees are hired "at-will." That is, they may be terminated for any reason that is not a violation of public policy or for the exercise of a constitutional or legal right. An at-will employment contract may be altered by oral or implied assurances from the employer that the employee will not be terminated for engaging in a certain act. In order to find for John J. Innes, you must find that the evidence establishes by a preponderance of the evidence: (1) That John J. Innes fully disclosed to Paul Howell, for Howell Corporation, the nature and extent of the consulting services he intended to perform for Jim Hogg and/or Commerce Coal Company; (2) That Paul N. Howell assured John J. Innes that John J. Innes would not be terminated for accepting consulting fees from Jim Hogg and/or Commerce Coal Company; and (3) That the Howell Corporation terminated John J. Innes' employment because of John J. Innes' receipt of consulting fees and thereby breached this implied contract.

Jury Interrogatory No. 1 asks:

Do you believe, from a preponderance of the evidence, that John J. Innes complied with his fiduciary duty to the Howell Corporation and Lake Coal Co., Inc. and fully disclosed the nature and extent of the con-

sulting fees with Jim Hogg and/or Commerce Coal?

_____YES _____NO

Do you believe, from a preponderance of the evidence, that Paul Howell, acting as an officer or director of the Howell Corporation, assured John J. Innes that he could perform consulting services for Jim Hogg and/or Commerce Coal Company and receive fees for such services?

_____YES _____NO

If BOTH of your answers to the questions above are "YES", then proceed to INTERROGATORY NO. 4. If your answer to EITHER OR BOTH of the above questions is "NO", then you have found for the Howell Corporation and should proceed to INTERROGATORY NO. 2.

Both the instruction and interrogatory make it quite clear that the finding on Innes's disclosure and the finding on Howell's assurances are independent determinations, each of which the jury must decide. Even if plaintiff is correct that the "fully disclosed" language of the first question in Interrogatory No. 1 was erroneous, nothing in the second question of Interrogatory No. 1 indicated to the jury that a negative answer to the first would necessitate a negative answer to the second. The jury could easily have found that Innes had not "fully disclosed the nature and extent of the consulting fees" but that Howell _had_ given Innes oral assurances in Jamaica that Innes "could perform consulting services" for Commerce Coal. This would not have been an illogical finding, and the interrogatory clearly states that this was permissible: the jury could answer "either or both" of the interrogatory questions with a "no." As it happens, the jury found no oral assurances, and so the question now of whether Innes "fully disclosed the nature and extent of the consulting fees" is moot.

▮ Second, even if the "fully disclosed" language conceivably could have influenced the jury, perhaps in some intangible or metaphysical way, toward finding no oral assurances, the language of the instruction is completely supported by Kentucky law. As a fiduciary of Lake Coal, Innes was required to disclose to the corporation any conflicts of interest, such as receiving payments from an independent contractor pursuant to a real property and services transaction in which the corporation is intimately involved. Kentucky case law states explicitly that the fiduciary "owes the duty of good faith and _full disclosure_ of the circumstances.... '[T]he disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all of its stark significance.'" _Aero Drapery of Kentucky, Inc. v. Engdahl_, 507 S.W.2d 166, 169 (Ky.1974) (quoting _Wendt v. Fischer_, 243 N.Y. 439, 154 N.E. 303, 304 (1926)) (emphasis added); _see also DSG Corp. v. Anderson_, 754 F.2d 678, 682 (6th Cir.1985) (relying on _Aero Drapery_ to find "full disclosure" obligation of fiduciary under Kentucky law).[4] In order for Paul Howell to have consented meaningfully to Innes's consulting arrangement, then, Innes would have had to inform him about it to the extent required by his fiduciary duties. Although it is theoretically possible for Paul Howell instead to have given Innes a blank check to enter into any consulting arrangement, plaintiff does not allege that any such broad waiver was ever given. Innes alleges that he told Howell about the arrangement and Howell merely "approved." Under the circumstances, Innes was required to give full disclosure of his consulting services and fees before expecting that he had a true oral agreement.

In sum, there was no error in either jury instruction.

## VII. CONCLUSION

Aside from her equal protection claim, plaintiff's arguments on appeal leave this court straining to discern even the semblance of merit. Although the question of KRS § 411.140's constitutionality is a close one, we conclude that the district court on that issue, as elsewhere, did not commit reversible er-

---

**4.** Plaintiff cites other cases concerning oral modifications of at-will employment contracts, in which no mention of the "full disclosure" requirement is made. _E.g., Hammond v. Heritage_ _Communications, Inc._, 756 S.W.2d 152 (Ky.Ct. App.1988). Plaintiff fails to note, however, that such cases have nothing to do with the duties of an employee who is a _fiduciary_ of the employer.

ror. The judgment of the district court is **AFFIRMED.**

BATCHELDER, Circuit Judge, concurring.

I concur in the reasoning and result of the majority's opinion with the exception of part II, where I concur in the result only.