William DIETRICH, by M. Nicol Padway, his Guardian Ad Litem and Thea Dietrich, Plaintiffs-Respondents,†

v.

WISCONSIN PATIENTS COMPENSATION FUND, James R. Sanger, M.D., Lawrence Clowry, M.D., and Sharon Elias, M.D., Defendants,

Erle PEACOCK, M.D., Defendant-Appellant.

Court of Appeals

No. 91-0764. Submitted on briefs March 4, 1992.—Decided May 12, 1992.

(Also reported in 485 N.W.2d 614.)

†Petition to review denied.

For defendant-appellant Erle Peacock the cause was submitted on the briefs of *Todd M. Weir* and *Mark A. Grady* of *Otjen, Van Ert, Stangle, Lieb & Weir, S.C.,* of Milwaukee.

For plaintiffs-respondents William Dietrich and Thea Dietrich the cause was submitted on the briefs of *Milton S. Padway* of *Padway & Padway, Ltd.,* of Milwaukee.

For the State Medical Society of Wisconsin, the cause was submitted on the amicus curiae brief of *Sally L. Wencel* and *Mark L. Adams* of the *State Medical Society of Wisconsin,* of Madison.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J.    Erle Peacock, M.D., a physician licensed to practice medicine in North Carolina, appeals from a nonfinal order denying his sec. 802.06(2)(c), Stats., motion to dismiss a malpractice action against him for want of personal jurisdiction.[1] He contends that neither sec. 801.05(3) (local act or omission) nor sec. 801.05(4)(a) and (b) (local injury; foreign act), Stats., apply and he therefore should be dismissed as a party from this action. We agree, and accordingly reverse and remand with directions to dismiss the action against Dr. Peacock.

---

[1]By order of May 9, 1991, this court vacated its own order of April 30, 1991, which denied Peacock's motion for leave to appeal. The entry of the May order has the effect of the filing of a notice of appeal. Rule 809.50(3), Stats.

I.

William Dietrich was born October 15, 1973. His parents first noticed lesions on his left ear and shoulder at the age of five. Sharon L. Elias, M.D., a plastic surgeon, excised the ear lesion on June 8, 1983, when it was the size of a pea. A pathologist diagnosed the lesion as a nodule subdural fibrosis. The lesion grew back. By May 1984, the ear lesion had grown to the size of a plum. Plastic surgeon James Sanger, M.D., and pathologist Lawrence Clowry, M.D., diagnosed the condition as neurofibromatosis. On September 11, 1984, plastic surgeon Paul Loewenstein, M.D., after a biopsy, concluded that William had juvenile fibromatosis. In October 1984, Dr. Sanger reexamined William, determined that the condition was not fibromatosis and reconfirmed his diagnosis of neurofibromatosis. In December 1984, Dr. Sanger excised the lesion consistent with his diagnosis of neurofibromatosis.

The lesion continued to grow. William was subsequently examined by Marvin Glicklich, M.D., at Children's Hospital and Annette Segura, M.D. They concluded that William had either keloids or fibromatosis, but not neurofibroma or neurofibromatosis. On February 3, 1986, plastic surgeon Roger C. Mixter, M.D. examined William at the University of Wisconsin Hospital. Dr. Mixter and David Dibbel, M.D., concluded that William had a keloid formation with a diagnosis of fibromatosis and that conservative treatment was not prudent. Upon examination of William on April 16, 1986, Dr. Mixter observed substantial enlargement of the left ear lesion. He decided to contact an expert, defendant Erle Peacock, M.D., of Chapel Hill, North Carolina.

On April 17, 1986, Dr. Mixter wrote a letter to Dr. Peacock, stating that "[w]e advised Mrs. [Thea] Dietrich

474

that conservative treatment of the ear was not possible at this time and we suggested your expert advice." William and his mother, Thea, consulted with Dr. Peacock at his office in Chapel Hill on April 21, 1986. Dr. Peacock examined William, reviewed his records and slides, and diagnosed his condition as juvenile fibromatosis. After several hours of examinations, tests and discussion, Dr. Peacock recommended a conservative excision of the growth followed by treatment with D-Penicillamine for six months. He never examined William again.

In a letter dated April 21, 1986, to Dr. Mixter, Dr. Peacock stated: "If I were treating William, I would excise all of the gross tumor without trying to perform a super radical exteneration of a malignant tumor but treat it like a benign tumor." Dr. Peacock also recommended D-Penicillamine as follow-up treatment for six months. In a letter dated April 24th, Dr. Mixter advised Dr. Peacock that he was discussing the treatment options with the patient and "will probably go with the limited excision and Penicillamine."

Hereafter, a series of letters and conversations occurred between Dr. Peacock and persons with an interest in the case. Some of the conversations were alleged by Thea and denied, and others are undisputed.

(1) April 28, 1986: Thea allegedly telephoned Dr. Peacock, who apparently indicated his willingness to work with Dr. Elias.

(2) May 1, 1986: Dr. Elias called Dr. Peacock and discussed William's treatment program.

(3) May 5, 1986: A letter from Dr. Elias to Dr. Peacock thanking him for remitting a copy of his letter to Dr. Mixter.

(4) <u>May 7, 1986:</u> Dr. Elias forwarded to Allan L. Goldman, M.D., a copy of Dr. Peacock's letter of April 27th to Dr. Mixter.

(5) <u>May 8, 1986:</u> Dr. Elias entered Dr. Peacock's treatment recommendation into William's Columbia Hospital Report of Surgical Procedure.

(6) <u>May 29, 1986:</u> Dr. Elias sent a letter to Dr. Goldman referencing Dr. Peacock's treatment recommendation.

(7) <u>September 25, 1986:</u> Dr. Elias' Columbia Hospital report of surgical procedure references her postoperative treatment of William with D-Penicillamine, consistent with Dr. Peacock's treatment recommendation.

(8) <u>September 9, 1987:</u> In Thea's alleged telephone conversation with Dr. Peacock, she expressed dissatisfaction with the treatment results. Dr. Peacock in turn allegedly suggested an increased dosage of D-Penicillamine, reexcision and preoperative administration of D-Penicillamine. Dr. Peacock denies that he suggested a change in the drug dosage.

(9) <u>October 26, 1987:</u> Thea called Dr. Peacock and allegedly informed him that Dr. Elias wanted to discontinue treatments. Dr. Peacock allegedly told her that Dr. Elias should find a neurologist who would administer larger doses of D-Penicillamine.[2]

[2]William also alleges that on November 25, 1987, an entry in Dr. Goldman's patient notes indicated that he increased the dosage "per his mother—discussion with Dr. Peacock." It is unclear from the record exactly what the notations, along with "per his mother—discussion with Dr. Peacock," means. Without a citation to testimony by Dr. Goldman as to what his handwriting says, we will not speculate. *Keplin v. Hardware Mut. Casualty Co.,* 24 Wis. 2d 319, 324, 129 N.W.2d 321, 323 (1964) (An appel-

(10) <u>May or June, 1988:</u> Thea allegedly called Dr. Peacock to inform him that Dr. Elias was about to discontinue his recommended treatment program. Dr. Peacock allegedly stated that he disagreed with Dr. Elias and that she should secure another doctor in Wisconsin or that he would treat William in North Carolina.

(11) <u>August 26, 1988:</u> Dr. Elias, by letter, informed Dr. Peacock that William served her with a malpractice complaint. On August 30, Dr. Peacock wrote Dr. Elias and volunteered to be an expert witness for her. She accepted. On November 28, Dr. Peacock wrote Dr. Elias telling her to have her attorney contact him.

(12) <u>October 27, 1988:</u> In response to Thea's call, Dr. Peacock forwarded to Dr. Loewenstein a copy of his April 21, 1986 letter to Dr. Mixter.

Dr. Peacock's total remuneration for William's examination and consultation in Chapel Hill, North Carolina on April 21, 1986, was $150. The fee was paid through an insurance policy. It is undisputed that Dr. Peacock neither initiated any contact with William or his mother, nor wrote any prescription for William. He has no patients, places no advertising, and makes no solicitations for business in Wisconsin.

## II.

Section 801.05, Stats., commonly referred to as the "long-arm statute," outlines the grounds for personal jurisdiction in Wisconsin. Subsections 801.05(3) and (4), Stats., provide:

late court need not sift through the record in search of facts to support an assertion.).

**(3)** LOCAL ACT OR OMISSION. In any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant.

**(4)** LOCAL INJURY; FOREIGN ACT. In any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury, either:

(a) Solicitation or service activities were carried on within this state by or on behalf of the defendant; or

(b) Products, materials or things processed, serviced or manufactured by the defendant were used or consumed within this state in the ordinary course of trade.

■

The supreme court in *In re All-Star Insurance,* 110 Wis. 2d 72, 76, 327 N.W.2d 648, 650 (1983), succinctly summarized the law of personal jurisdiction as follows:

The determination of whether Wisconsin courts have jurisdiction over a nonresident defendant is a two-step process. First, it must be determined whether the defendants' contacts with Wisconsin subject them to jurisdiction under a Wisconsin long arm statute. If so, then the court must determine whether the exercise of jurisdiction under the statute comports with due process requirements.

"The plaintiff has the burden of proving jurisdiction." *M.C.I., Inc. v. Elbin,* 146 Wis. 2d 239, 242, 430 N.W.2d 366, 368 (Ct. App. 1988). The long-arm statute is to be liberally construed in favor of exercising jurisdiction. *Id.* A circuit court's findings of fact supporting jurisdiction will be adopted by a reviewing court "unless they are clearly erroneous." *Id.* Nevertheless, an appellate court

478

will "conduct an independent review of the [circuit] court's ultimate determination on the sufficiency of the state contacts." *Id.* at 242–43, 43 N.W.2d at 368.

## III.

William argues that Dr. Peacock's activities subsequent to his examination of William on April 21, 1986, constitute acts or omissions within this state under the purview of sec. 801.05(3) or sec. 801.05(4)(a) and (b), Stats. He relies on *Fields v. Playboy Club of Lake Geneva, Inc.,* 75 Wis. 2d 644, 250 N.W.2d 311 (1977) to argue that Dr. Peacock's contacts are sufficient to bring him within either subsections 801.05(3) or (4)(a), Stats. In *Fields,* the supreme court determined that the circuit court's finding that the contacts of the German manufacturer of the allegedly defective Audi automobile had evidentiary support. This evidence included an extensive advertising campaign in Wisconsin and the sale of forty-one Audi automobiles to Wisconsin residents in a year and a half. The court noted that while a single act is enough to satisfy due process concerns, these statutes require "[a]n additional contact" to meet the test of jurisdictional sufficiency. *Id.* at 651, 250 N.W.2d at 315. The court concluded that the amenability to jurisdiction was established "by the tort *and* by the presence of numerous Audi automobiles in Wisconsin in the course of trade *and* by the solicitation of Audi business in this state." *Id.* at 651–52, 250 N.W.2d at 315 (emphasis supplied).

We conclude as a matter of law that Dr. Peacock committed no "act or omission" in Wisconsin within the scope of sec. 801.05(3), Stats. The record shows that he provided no services in Wisconsin. He did not place any

479

telephone calls to Wisconsin and only answered telephone calls originating from Wisconsin. He provided no prescriptions to William. Dr. Mixter and Dr. Elias treated William in Wisconsin, which included the issuance of a prescription for D-Penicillamine. Essentially, Dr. Peacock was merely called upon to render a supplemental medical opinion when William visited him in Chapel Hill.

We further conclude that subsections 801.05(4)(a) and (b), Stats., are inapplicable because the words "in addition" unambiguously require some activity other than the act or omission outside Wisconsin giving rise to an injury here. As to subsection (a), the record presents no evidence of any solicitation or service activities of Dr. Peacock in Wisconsin. As to subsection (b), it is inapplicable because the case does not involve commodities in the "ordinary course of trade." We conclude that *Fields* does not support William's argument.

We also conclude that telephone calls received by a defendant do not, standing alone, constitute contact with Wisconsin sufficient to establish a basis for personal jurisdiction. In *Tavoulareas v. Comnas,* 720 F.2d 192 (D.C. Cir. 1983), the court rejected an argument that the jurisdictional statute of the District of Columbia covered a Wisconsin citizen who was sued for making defamatory statements over the telephone to a resident of the District of Columbia. The United States Court of Appeals said that the calls were not acts occurring in the District "[u]nless we wish to delve into a magical mystery tour of 'projecting presences.' " *Id.* at 194 (citation omitted).

Dr. Peacock provided a courtesy to William and his treating physicians in Wisconsin when he rendered a supplementary opinion regarding William's condition. The uncontroverted evidence, together with the disputed facts, even if assumed true and viewed favorably to William, do not rise to the level of contacts with this state sufficient to warrant personal jurisdiction over Dr. Peacock. Because William failed to establish that personal jurisdiction existed over Dr. Peacock, the trial court erred in dismissing his motion to dismiss the malpractice action.

Because this appeal is decided on jurisdictional grounds, it is not necessary to consider Dr. Peacock's due process and public policy arguments. *See In re All-Star Ins.*, 110 Wis. 2d at 76, 327 N.W.2d at 650.

*By the Court.*—Order reversed and cause remanded with directions to dismiss the malpractice action against Dr. Peacock.