Nick SCHIMPF, Helen Schimpf, Frank Schimpf, Bonnie Schimpf, Alfred Schimpf, Edith Schimpf, Ernest Schimpf, Christine Schimpf, Helga Schimpf–Heizmann, John Heizmann, S & R Egg Farm, Inc., Frank Schwarzmann and Eve Schwarzmann, Plaintiffs,

v.

GERALD, INC. and Edward Keiser, Defendants.

No. 97–C–545.

United States District Court, E.D. Wisconsin.

April 24, 1998.

James E. Culhane, Susan G. Shellinger, Davis & Kuelthau, Milwaukee, WI, for Plaintiffs.

Scott W. Hansen, Reinhart, Patrick J. Hodan, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, for Defendant Gerald Inc.

Janice A. Rhodes, Kravit & Gass, Milwaukee, WI, for Defendant Ed Keiser & Charles Marino.

## DECISION AND ORDER

ADELMAN, District Judge.

Currently pending before me are two motions: (1) the plaintiffs' motion for reconsideration of an order substituting the administrator of defendant Edward Keiser's estate for Keiser, and (2) Keiser's (or his representative's) motion to dismiss the case for lack of personal jurisdiction or to transfer it to the Northern District of Illinois. For the reasons set forth below, the motion for reconsideration will be granted and upon reconsideration the motion for substitution will be granted in part and denied in part, and the motion to dismiss or transfer the case will be denied.

## I. Factual and Procedural Background

The following facts derive from the Amended Complaint. The twelve individual plaintiffs in this case are relatives, all living in Wisconsin. Plaintiff S & R Egg Farms, Inc., their family business, is a Wisconsin

corporation; its principal place of business is in Wisconsin. Defendant Gerald, Inc. is a New York corporation; its principal place of business is in New York. At all times material to this lawsuit, Gerald had an office in Chicago, Illinois, and was in the business of buying and selling commodities for customers through the Chicago Board of Trade. Defendant Edward Keiser lived in Illinois at the time this case was filed; Keiser was Gerald's vice president of accounts in its Chicago office.

Although not a party to this lawsuit, Michael Schwarzmann ("Michael") played a large role in causing it. Michael is a close relative of the individual plaintiffs. Working through his company, M.S.I. Capital Management, Michael held himself out as an expert and investor in the commodities futures market. He solicited funds from the plaintiffs, who gave him substantial amounts of money to invest on their behalf, based on Michael's representation that the money would be invested with defendants Keiser and Gerald in Chicago. Michael's parents, Eve and Frank Schwarzmann, for instance, gave him $332,-000, aunt and uncle Helen and Nick Schimpf gave Michael $881,200, and S & R put in $578,000, all of which was supposed to be invested with Gerald.

But rather than investing the money, Michael and Keiser allegedly were defrauding plaintiffs. Michael invested little, if any, of his relatives' money with Gerald. Instead, by making small "interest" payments and by providing plaintiffs with falsified statements, Michael was able to keep them satisfied and unconcerned, while he used the money for his own purposes. In 1995 Michael pled guilty to wire fraud in connection with the scam. According to plaintiffs, Keiser used his position at Gerald to assist Michael in various ways.

Plaintiffs allege they are still short approximately $1,265,000. On March 31, 1997, they filed this lawsuit against Keiser and Gerald in an attempt to recover that money. Plaintiffs brought the case in Walworth County Circuit Court, but defendants removed it to this district on May 8, 1997, because diversity jurisdiction exists under 28 U.S.C. § 1332. Plaintiffs allege three causes of action: (1) civil conspiracy to defraud, (2) violation of the Wisconsin Organized Crime Control Act (WOCCA), Wis. Stat. §§ 946.80–946.88, and (3) negligent misrepresentation. According to plaintiffs, Gerald is liable because at all times material, Keiser was acting within the scope of his employment and was Gerald's agent.

In 1997, Keiser died. Plaintiffs filed a suggestion of death and moved to substitute Charles F. Marino, administrator of Keiser's estate, for Keiser. At the time of the motion, this case was assigned to District Judge Rudolph T. Randa. Judge Randa granted the motion for substitution on December 2, 1997, but he inaccurately calculated the deadline for responses and incorrectly assumed the defendants and the estate had no objection, as none had been filed. On December 8, Gerald filed a motion for reconsideration, indicating it indeed planned to object. The next day Judge Randa acknowledged the mistake, indicated he would accept responses to the motion for substitution, and ordered his prior ruling on the substitution matter held in abeyance pending further review of the merits of the issue. The case was transferred to me when I became a district judge. The parties have since fully briefed the motion for substitution and agree that reconsideration is appropriate. As the objection to substitution of the estate for Keiser concerns only the second count of the Amended Complaint, Judge Randa's order granting the substitution will be reinstated as to counts one and three.

On January 6, 1998, the estate (assuming it would be substituted for at least part of the case) filed a motion to dismiss the claims against it for lack of personal jurisdiction or, alternatively, for transfer of the case to the Northern District of Illinois. That motion has been fully briefed as well. Plaintiffs have since filed an Amended Complaint. The motion to dismiss or transfer has been renewed as to the Amended Complaint and is ready for decision.

## II. Survival of WOCCA Claim Against Keiser

### A. Survival is an Issue of Wisconsin Law

Federal Rule of Civil Procedure 25(a)(1) (emphasis added) states that "[i]f a party

dies *and the claim is not thereby extinguished*, the court may order substitution of the proper parties." In their motion for substitution plaintiffs asserted that the WOCCA claim was not extinguished by Keiser's death and thus Marino and the estate should be substituted as defendants for all claims. Notice of Motion and Motion for Substitution (Nov. 17, 1997) at 2. Keiser's estate and Gerald object to the substitution because they believe the WOCCA count of the Amended Complaint expired along with Keiser. According to Gerald, because its liability would be derivative of Keiser's the WOCCA count evaporates against it as well as the estate.

■ Whether an action survives the death of a party must be determined by looking to the law, state or federal, under which the cause of action arose. *Continental Assurance Co. v. American Bankshares Corp.*, 483 F.Supp. 175, 177 (E.D.Wis.1980). Wisconsin case law does not address whether a WOCCA civil claim survives death. In the absence of a legal ruling directly on point by the state courts, a federal court should rule as the state supreme court would, if squarely presented with the issue. *L.S. Heath & Son v. AT&T Info. Sys.*, 9 F.3d 561, 574 (7th Cir.1993).

Survivability of plaintiffs' WOCCA claim is governed first and foremost by Wisconsin's omnibus survival statute, Wis. Stat. § 895.01(1), which provides that all "causes of action that survive at common law" survive in Wisconsin, as do certain other specified causes of action, including claims "for all damage done to the property rights or interest of another." The list of causes enumerated in section 895.01(1) is exclusive, *In re Marriage of Pettygrove by Scholl v. Pettygrove*, 132 Wis.2d 456, 463, 393 N.W.2d 116 (Ct.App.1986), and a WOCCA claim is not among them. WOCCA itself fails to address the survivability of a civil lawsuit brought under its terms. Therefore, unless a WOCCA cause of action can be considered a "cause[ ] of action that survive[s] at common law" in Wisconsin, or a statutory action for "damage done" to property rights, it evaporated when Keiser died.

■ Plaintiffs' WOCCA claim does not "survive at common law." The original version of Wisconsin's survival statute was enacted in 1849, *see* Wis. Stat. § 895.01 note (Historical and Statutory Notes); *Prunty v. Schwantes*, 40 Wis.2d 418, 422 n. 3, 162 N.W.2d 34 (1968), and the "causes of action that survive at common law" appear to have been fixed at that time, *see Prunty*, 40 Wis.2d at 424, 162 N.W.2d 34 (because personal injury cause of action did not survive death of injured party until legislature acted in 1887, "it is quite obvious that the common law of Wisconsin will not support an award of damages to the deceased's estate" under version of survival statute in effect in 1968). WOCCA became effective in 1982. *See* Wis. Stat. §§ 946.80–946.88 notes (Historical and Statutory Notes). Thus a WOCCA claim is not part of the "common law" as contemplated in section 895.01(1). And even if "causes of action that survive at common law" as stated in section 895.01(1) is a developing concept, the Wisconsin Supreme Court recognizes as "an accepted axiom of law in Wisconsin" that "[s]tatutes are not to be construed as changing the common law unless the purpose to effect such change is clearly expressed therein." *Kranzush v. Badger State Mutual Cas. Co.*, 103 Wis.2d 56, 74, 307 N.W.2d 256 (1981). WOCCA is silent in regard to any intent to change the common law. *See* Wis. Stat. §§ 946.80–946.88.

■ Therefore, in order to survive, a WOCCA civil suit would have to be deemed a claim "for all damage done to the property rights or interest of another." "Damage" is undefined by the statute, but, in general, it means a "[l]oss, injury, or deterioration", that produces "a right in them who have suffered any damage ... to demand reparation of such damage from the authors of the injury." Black's Law Dictionary 389 (6th ed.1990). A person who has suffered "loss, detriment, or injury" then may be able to recover "damages", meaning "a pecuniary compensation or indemnity." *Id.; see also Employers Mut. Liab. Ins. Co. v. De Bruin*, 271 Wis. 412, 414, 73 N.W.2d 479 (1955) (defining "damages" as "a compensation, recompense, or satisfaction in money for a loss or injury sustained"). The key question, then, as all parties recognize, is whether the WOCCA civil cause of action is deemed compensatory or remedial,

in which case it survives, versus penal, in which case it has been extinguished.[1]

## B. Is the WOCCA Claim Penal or Compensatory?

### 1. Case Law With Respect to RICO Claims

The Seventh Circuit has a test for determining whether a cause of action is penal or remedial in nature. *See Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 414 (7th Cir.1980), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182, 194 (7th Cir.1982). Wisconsin does not appear to have a similar test. While the *Smith* test does not necessarily apply to a state statute, with no state test *Smith* nevertheless is helpful.

In addition, WOCCA is patterned on the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, *State v. Evers*, 163 Wis.2d 725, 730, 472 N.W.2d 828 (Ct.App.1991), and Wisconsin courts have held federal case law interpreting RICO to be persuasive authority in interpreting WOCCA, *State v. Mueller*, 201 Wis.2d 121, 144, 549 N.W.2d 455 (Ct.App. 1996); *Evers*, 163 Wis.2d at 732, 472 N.W.2d 828.

Numerous decisions regarding the survivability of RICO treble-damages citizen suits indicate a split of authority. Several courts, almost all of them located in the Northern District of Illinois, have determined such lawsuits to be penal and have found they do not survive the passing of a party. *See, e.g., Confederation Life Ins. Co. v. Goodman*, 842 F.Supp. 836, 837–38 (E.D.Pa.1994); *Ball v. Marshall Field V*, 1993 WL 101485, *9 (N.D.Ill.1993); *Lincoln Nat'l Life Ins. Co. v. Silver*, 1990 WL 160037, *6 (N.D.Ill.1990); *Washburn v. Brown*, 1988 WL 130021, *3 (N.D.Ill.1988); *Eliasen v. Hamilton*, 1987 WL 7815, *10–*11 (N.D.Ill.1987); *First Interstate Bank of Nevada, N.A. v. National Republic Bank*, 1985 WL 1118, *3–*4 (N.D.Ill.1985).

Other courts, notably the Fourth Circuit and a judge in the Northern District of Indiana, have decided that the RICO treble-damages provision is remedial and thus survives death. *See, e.g., Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir.1991); *Epstein v. Epstein*, 966 F.Supp. 260, 262–63 (S.D.N.Y. 1997); *Holford USA Ltd. v. Harvey*, 169 F.R.D. 41, 43 (S.D.N.Y.1996); *First Am. Corp. v. Al–Nahyan*, 948 F.Supp. 1107, 1122 (D.D.C.1996); *County of Oakland by Kuhn v. City of Detroit*, 784 F.Supp. 1275, 1285 (E.D.Mich.1992); *State Farm Fire and Cas. Co. v. Estate of Caton*, 540 F.Supp. 673, 681–82 (N.D.Ind.1982), *overruled on other grounds by Ashland Oil, Inc. v. Arnett*, 656 F.Supp. 950, 953 (N.D.Ind.1987). Moreover, RICO's treble-damages civil suit provision in turn is patterned on that found in section 4 of the Clayton Act, 15 U.S.C. § 15, and several cases have held that antitrust treble-damage claims are compensatory or survive the death of a party. *See, e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 485–86, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (recognizing § 4's dual nature but concluding that "[i]t nevertheless is true that the treble-damages provision, which makes awards available only to injured parties, and measures the awards by a multiple of the injury actually proved, is designed primarily as a remedy"); *Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir.1986) (holding that antitrust treble damage claims do not abate with death of defendant); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 635, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("Notwithstanding its important incidental policing function, the treble-damages cause of action conferred on private parties by § 4 of the Clayton Act, 15 U.S.C. § 15, ... seeks primarily to enable an in-

---

1. Even if WOCCA existed at the time Wisconsin codified the survival of common law claims, if the double-damages provision is penal in nature it nevertheless would abate. At common law, actions on penal statutes did not survive death, *Ex parte Schreiber*, 110 U.S. 76, 80, 3 S.Ct. 423, 28 L.Ed. 65 (1884), because a deceased criminal could no longer be punished, *Canino v. New York News, Inc.*, 96 N.J. 189, 475 A.2d 528, 529 (1984). "Death pays all when the criminal has gone. 'The party cannot be punished when he is dead.'" Winfield, *Death as Affecting Liability in Tort*, 29 Colum. L. Rev. 239, 249 (1920) (quoting Pollock, *Law of Torts* 578 (12 ed.1923)), *quoted in Canino*, 475 A.2d at 529. Abatement of criminal actions upon death of the defendant continues today. *See United States v. Zizzo*, 120 F.3d 1338, 1346 (7th Cir.1997).

jured competitor to gain compensation for that injury.").

## 2. Damages and Costs Under WOCCA Exceed Compensation

Because survivability is determined by looking to the law of the jurisdiction under which the cause of action arose, *Continental*, 483 F.Supp. at 177, analysis begins with the language of WOCCA itself. Wisconsin Statute § 946.87(4) states that "[a]ny person who is injured by reason of [a WOCCA violation] has a cause of action for 2 times the actual damages sustained and, when appropriate, punitive damages. The person shall also recover attorney fees and costs of the investigation and litigation reasonably incurred...."

Plaintiffs first point out that subsection 946.87(4) speaks of "damages" and "recover[y]"; they contend that these terms mean the section is compensatory. I am not convinced. The statute imposes a mandatory doubling of actual damages, plus payment of the victim's attorney fees and litigation expenses, plus cost of the pre-lawsuit investigation. The double-damages provision alone exceeds what can be deemed mere compensation and remedy for harm done. To the extent they exceed actual damages, multiple damages by their nature are "exemplary"— they do not compensate for the individual harm suffered as much as they serve as a deterrent. *Eliasen*, 1987 WL 7815 at *11.

Plaintiffs next argue that because the Wisconsin legislature included in subsection 946.87(4) both double damages *and*, when appropriate, punitive damages, the legislature must have considered the double damages simply to be compensatory—in other words, plaintiffs say, double damages must be "something other than punitive," Brief in Response (Dec. 22, 1997) at 3, or else the legislature would not have included both. I again disagree. In *John Mohr & Sons, Inc. v. Jahnke*, 55 Wis.2d 402, 412, 198 N.W.2d 363 (1972), which involved a jury's finding of an illegal conspiracy in restraint of trade and its award of both statutory treble damages and common-law punitive damages to the plaintiff, the Supreme Court of Wisconsin struck the punitive damages award because the statutory remedy was exclusive. The WOCCA legislature appears simply to have enacted statutory punitive damages to get around the problem of common-law punitive damages being excluded under *John Mohr*. An award of punitive damages is not identical to or truly duplicative of automatic multiplied damages. *See Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.*, 190 Wis.2d 650, 660 n. 9, 529 N.W.2d 905 (1995) (noting, for example, that willful, wanton or reckless behavior generally must be proven to recover punitive damages but not treble damages, and the wealth of a defendant bears on the calculation of punitive damages while statutory multiple damages are based on an automatic multiplier of actual damages). The legislature's inclusion of both types of damages merely provides for an automatic type of fine as well as a variable component within the jury's discretion for egregious situations. It does not mean that the legislature treated double damages solely as compensation for injury.

## 3. Purpose of WOCCA is to Fight Crime

Plaintiffs next point to the Wisconsin legislature's expression of intent for WOCCA, which is set forth in Wisconsin Statute § 946.81: "The legislature declares that the intent of the Wisconsin Organized Crime Control Act is to impose sanctions against this subversion of the economy by organized criminal elements and to provide compensation to private persons thereby...." According to plaintiffs, the "sanctions" discussed in section 946.81 must be WOCCA's criminal penalties and fines and the "compensation" is the legislature's recognition of remedial subsection 946.87(4). Plaintiffs have left out the immediately preceding sentence, though, which gives better insight into the overall nature of WOCCA. Read together, the two sentences state:

The legislature finds that a severe problem is posed in this state by the increasing organization among certain criminal elements and the increasing extent to which criminal activities and funds acquired as a result of criminal activity are being directed to and against the legitimate economy of the state. The legislature declares that the intent of the Wisconsin Organized Crime Control Act is to impose sanctions against this subversion of the economy by organized criminal elements and to provide

compensation to private persons injured thereby....

The additional language shows the real focus of WOCCA to be a response to crime. Nothing in the language of the statute suggests that the Wisconsin legislature intended to exclude subsection 946.87(4) when it stated that its goal was to address criminal activities and "impose sanctions against this subversion of the economy."

The WOCCA title and section 946.87's placement within the Wisconsin statutes further suggest that the double-damages provision is penal in nature. Section 946.87 is part of the Wisconsin Organized *Crime Control* Act, which addresses the problem of criminal behavior and creates criminal sanctions triggered by such conduct. When determining whether a particular statutory provision is punitive, courts generally look in the first instance to whether the purpose of the statute *as a whole* primarily redresses individual wrongs or more general wrongs to the public. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 912 (3d Cir.1991). Section 946.87 is just one small part of a predominantly penal act and is merely one piece of the puzzle in trying to solve the problem of crime. Moreover, section 946.87 also is part of the Chapter of the Wisconsin Statutes entitled "Crimes Against Government and Its Administration." Other portions of Chapter 946 address, for instance, treason, bribery, perjury, interference with law enforcement, and obstruction of justice. *See* Wis. Stat., ch. 946. The placement of section 946.87 with all of these criminal statutes involving injury to government (and thus the public) buttresses the view that Wisconsin's legislature intended the double damages provision to be penal.

### 4. Wisconsin Statute Indicates Double Damages Not Compensatory

The statute immediately following Wisconsin's omnibus survival statute expressly prohibits the recovery of "vindictive or exemplary damages" against the executor or administrator of an estate and limits recovery to damages actually sustained. Wis. Stat. § 895.02. Section 895.02 thus treats claims for amounts in excess of actual damages as if they cannot survive against an estate. Because a WOCCA civil claim mandates double damages, permitting a WOC-

CA claim to be brought against an estate would be inconsistent with § 895.02.

### 5. No Wisconsin Case Law Directly On Point

Having analyzed the statutory language, I next look to Wisconsin case law. In *Carlson, supra,* the defendants argued that antitrust treble damages were considered punitive in nature and thus claims for such damages required the same "middle" (i.e. clear and convincing) burden of proof as used for common-law punitive claims. The court rejected the argument and held that the lower preponderance of the evidence standard applied, but stated: "Nor are treble damages in Wisconsin private, civil antitrust actions solely or predominantly punitive, as the defendants assert." A more accurate portrayal of the case law is that the state "antitrust laws are remedial in nature as well as penal...." *Carlson,* 190 Wis.2d at 667, 529 N.W.2d 905. *Carlson* thus does not solve the penal/remedial dichotomy.

### 6. *Smith* and RICO Cases From N.D. Ill. Suggest WOCCA Claim Penal

The Seventh Circuit's *Smith* test and the RICO cases from the Northern District of Illinois and the Eastern District of Pennsylvania, however, solidify the conclusion that a WOCCA civil claim is penal in nature. *Smith* sets forth a three-part test for determining whether an action is penal for survival purposes: (1) whether the purpose of the action is to redress individual wrongs or wrongs to the public, (2) whether recovery runs to the individual or to the public, and (3) whether the authorized recovery is wholly disproportionate to the harm suffered. *Smith,* 615 F.2d at 414. As *Washburn, supra,* and *First Interstate, supra,* similarly concluded in regard to RICO civil suits, the *Smith* test indicates WOCCA civil suits are penal. Only the second factor of the test suggests a remedial nature, because recovery does run to the individual. The other two factors point toward WOCCA's penal nature.

In regard to the first factor, although section 946.87(4) itself may redress individual wrongs, its broader purpose and that of WOCCA overall is to redress wrongs to the public, based upon the same reasoning set forth above regarding legislative intent and

WOCCA's placement within the Wisconsin code. *See also Genty,* 937 F.2d at 910 ("The criminal and civil penalties in [RICO] thus comprise sharply-cutting edges of a double-edged sword to strike more completely the insidious influences plaguing our nation's enterprises.... [T]here is convincing authority that Congress authorized civil RICO's powerful treble damages provision to serve a punitive purpose.").

And in regard to the third factor, the authorized recovery is wholly disproportionate to the harm suffered. Because the amount of damages under WOCCA are unlimited, so is the potential penalty. Unlike *Smith,* where the Seventh Circuit determined that a fine pursuant to the Truth in Lending Act, 15 U.S.C. § 1640, was not penal because it was limited to modest amounts of not more than $1,000, *see Smith,* 615 F.2d at 414–15, the penalty under WOCCA can be extraordinary. A $100,000 penalty added to damages of $100,000, for example, is wholly disproportionate, especially because it is unrelated to any degree of willfulness or intent to injure.

### 7. Arguments That WOCCA Claims Are Civil Are Less Persuasive

The courts finding that RICO civil claims survive death rely mainly on Congress's statement that RICO provisions "shall be liberally construed to effectuate its *remedial* purpose," Pub. Law No. 91–452 § 904(a), 84 Stat. 947, *reprinted* following 18 U.S.C. § 1961 note (emphasis added), the fact that recovery runs to a private individual, the parallels in antitrust law, and certain Supreme Court comments in *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). *See, e.g., First American,* 948 F.Supp. at 1122; *County of Oakland,* 784 F.Supp. at 1285; *Epstein,* 966 F.Supp. at 262. None of these reasons changes my view that the WOCCA civil cause of action is penal in nature.

The first two reasons are easily dismissed. The "liberal construction" phrase from Congress can be read to encourage active use of both RICO's criminal and civil provisions to combat and "remedy" crime. And the fact that recovery runs to the individual is only one factor among at least three, as *Smith* recognizes.

While courts generally have found the treble damages provision of the antitrust laws to be remedial in nature, and RICO (and one step further down the line, WOCCA) is patterned on the antitrust provision, those decisions do not mandate any decision here. In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court cautioned against leaning heavily on antitrust case law for interpreting RICO; by making RICO a separate statute, Congress hoped to avoid strangling RICO with antitrust precedent. Embedding federal antitrust precedent into RICO survivability issues would create the problem that Congress expressly sought to avoid with RICO. Even statements of members of Congress involved in enacting RICO suggest that the RICO treble damages provision was not simply a rubber-stamp of the antitrust provision. *See Sedima,* 473 U.S. at 487–88, 105 S.Ct. 3275 (discussing comments by legislators indicating that treble-damages provision was "another example of the antitrust remedy being *adapted* for use against organized criminality," 116 Cong. Rec. 35295 (1970) (emphasis added)).

Most significantly, there is little correspondence between the types of conduct the antitrust laws and RICO and WOCCA prohibit; the former is concerned with regulating competition, the latter with defeating and deterring crime. RICO and WOCCA, each taken as a whole, are more penal in nature—i.e. aimed directly at the public's common notions of crime—than the antitrust laws, and can be deemed so even though similar language regarding remedies may exist in both. And while *Fishman* is precedent for this court, the Seventh Circuit spent little time analyzing the remedial/punitive issue and itself based the *Fishman* decision on the "precise circumstances" of the case. *Fishman,* 807 F.2d at 561. In spite of the parallel language between RICO and the antitrust acts, and in spite of *Fishman,* the judges of the Northern District of Illinois have found it inappropriate simply to adopt antitrust law interpretation for RICO civil claims. I similarly decline to find that antitrust case law rules control WOCCA civil claims.

In *Shearson* the United States Supreme Court opined that the emphasis placed on the civil treble damage award of section 1964(c) by Congress is remedial first and only secondarily penal. *Shearson,* 482 U.S. at 240–42, 107 S.Ct. 2332. In *Shearson* the Court determined that parties could agree to arbitrate RICO treble-damages claims. *Id.* at 238–42, 107 S.Ct. 2332. The Supreme Court first found no hint that Congress intended for RICO treble-damages claims to be exempt from the provisions of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* and then found no public interest in the enforcement of RICO precluding submission of such claims to arbitration. *Id.* at 238–42, 107 S.Ct. 2332. Regarding the latter issue, the Court analyzed statements of various legislators and concluded that the RICO treble-damages provision focused on the remedial rather than the deterrent function. According to the Court, "[t]he legislative history of § 1964(c) reveals the ... emphasis on the remedial role of the treble-damages provision.... The policing function of § 1964(c), although important, was a secondary concern." *Id.* at 240–41, 107 S.Ct. 2332.

The Court's comment was dicta, however, and this statement in the context of arbitrability does not govern survivability as well. As is clear by now, the multiple damages provisions of RICO and WOCCA can be considered compensatory for some purposes and penal for others. The *Shearson* Court itself, while emphasizing the remedial function for purposes of the arbitrability issue, nevertheless also recognized that "RICO's drafters likewise sought to provide vigorous incentives for plaintiffs to pursue RICO claims that would advance society's fight against organized crime." *Id.* at 241, 107 S.Ct. 2332. A multiple-damages provision's dual nature can result in it being considered more like a compensatory remedy for purposes of arbitration, which involves looking only at the nature of the treble-damages provision itself, while being considered more like a penalty for purposes of survivability, which, as the *Smith* test indicates, involves a broader look at the provision's overall purpose and placement in the statutory scheme. *See Lincoln Nat'l,* 1990 WL 160037 at *4 "([I]t is clear that both RICO and the Clayton Act contain elements that are both penal and remedial;

thus, depending on the context, a claim may be characterized one way or the other."); *see also Genty,* 937 F.2d at 913–14 (discussing *Shearson* but finding the RICO treble-damages cause of action penal for its purposes); *compare Shearson, supra, with Sedima,* 473 U.S. at 498, 105 S.Ct. 3275 ("RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime.... it is in this spirit that all of the Act's provisions should be read.").

*Shearson* and antitrust precedent do not overcome the essential nature of the WOCCA statute itself and the persuasive reasoning of *Washburn, Ball, Lincoln National,* and *Confederation Life* regarding RICO civil suits, all of which were decided after *Shearson* and yet concluded that the RICO claims were extinguished by death, and the comments in *Genty,* also written after *Shearson* yet finding it not to control.

For all of the foregoing reasons, I believe the Supreme Court of Wisconsin would hold plaintiffs' WOCCA double-damages civil cause of action to be penal in nature. The claim died when Keiser died, and thus the estate cannot be substituted for Keiser on that count.

### III. Survival of WOCCA Claim Against Gerald

█ Gerald, however, is another matter. Gerald argues that because the claim against Keiser no longer exists and its liability is secondary to Keiser's, the plaintiffs' WOCCA claim against it must abate as well. Gerald cites *Wiechmann v. Huber,* 211 Wis. 333, 248 N.W. 112 (1933), for support. In *Wiechmann,* the plaintiff sued an insured and his insurance carrier for damages arising from the death of her husband, who was killed in an automobile accident while riding with the insured. The insured died shortly after the collision and plaintiff conceded that any action against him abated with his death under the survival statute existing at that time. *Id.* at 334, 248 N.W. 112. She nevertheless asserted a claim against the insurance company pursuant to the insured's policy. The Supreme Court of Wisconsin found that no action against the insurer could lie either. *Id.* at 334–36, 248 N.W. 112.

*Wiechmann* is distinguishable from the present situation, as it was not based upon reasons of respondeat superior at all. The court instead based its decision on the language of the policy, which insured against "loss and/or expense arising or resulting *from claims upon the assured* ....", *id.* at 335, 248 N.W. 112 (emphasis added), and the terms of state statutes, which indicated that in a motor vehicle case any insurer could be held directly liable and made a proper defendant "in any action brought by plaintiff *on account of any claim against the insured,*" *id.* As the court stated,

> It is quite impossible to read into the statutes an intent to create a liability on the part of the insurance carrier completely dissociated from the liability of the insured. The terms of this policy are as positive as may be to the effect that the liability of the insurer depends upon the liability of the insured.
>
> \*     \*     \*     \*     \*     \*
>
> ...[N]othing in [other] statues affects the terms of the policy here considered, which requires as a substantive matter a valid existing claim against the insured before a liability against the insurer in favor of a third party beneficiary can exist.

*Id.* at 336, 248 N.W. 112.

Plaintiffs, however, offer a case directly on point: *Soraghan v. Henlopen Acres, Inc.,* 236 F.Supp. 489 (D.Del.1964). In *Soraghan* defendant Corkran died after commencement of the lawsuit, and it was plain that the defamation cause of action against Corkran abated with his death under the Delaware survival statute. *Id.* at 489–90. The district court found the plaintiff's respondeat superior claim against Corkran's former employer did *not* abate, even in the face of an argument virtually identical to Gerald's here. *Id.* at 490–91. The court found that while Corkran's death forestalled any judgment of liability against him personally or against his estate, it was not as if the plaintiff's claim had been adjudged to be without merit.

> Certainly the court would not dispute the argument that where Corkran was acquitted of a libel, presumably on the grounds that he had committed none, his corporation could not be liable.... But the situation is quite different where by death or by operation of law an action against the cor-

poration's agent has abated. This is not the same as a judgment on the merits and should not bar the plaintiff from getting such a judgment against the corporation.

> \*     \*     \*     \*     \*     \*
>
> ... Once [the employee] has acted, if he has acted in the corporation's behalf, any stigma which arises due to his act immediately attaches to the corporation. The subsequent death of the agent tortfeasor does not alter this.

*Id.* at 490–91.

The court has found extremely little case law on the subject, but what there is comports with *Soraghan.* In *Manson v. Wabash R.R. Co.,* 338 S.W.2d 54 (Mo.1960) (en banc), the Supreme Court of Missouri considered whether a respondeat superior case against employer Wabash abated when the two employees charged with assault and false imprisonment died while the case was pending. The court found that the causes of action against Wabash did not die with the employees because the master and servant "were jointly and severally liable for assault and false imprisonment committed by the servant in the scope and course of his employment.... Where there is joint and several liability the injured person may sue all defendants jointly, or either separately." *Id.* at 57.

In *Biel, Inc. v. Kirsch,* 240 Ind. 69, 161 N.E.2d 617 (1959), the Supreme Court of Indiana expressly disapproved of an appellate court's holding that a cause of action against a corporate defendant based solely upon the theory of respondeat superior abated for any amount in excess of what the law would have permitted against the estate of the corporate defendant's deceased driver. *Id.* 161 N.E.2d at 618. The higher court concurred, however, in the result based upon other grounds and therefore did not itself address the issue. Comments of two judges of the Supreme Court of Indiana in regard to the transfer of the case to that court for review are instructive, though:

> The fact that upon the death of an agent the liability in a negligence case is limited or extinguished against his estate, should

not accrue to the benefit of the principal and release the principal also from liability.

There is no analogy in the instant case and one in which a jury or court finds the agent not guilty of negligence for which the principal at the same time is held liable. The negligence still exists, even though the agent may die or his liability be limited by statute in the case before us.

... It was not intended a principal should get the benefit of a special privilege allowed a deceased agent's estate by limiting the amount of recovery therefrom in case of death.

\* \* \* \* \* \*

It likewise follows that a privilege personal to an agent or his estate may not be claimed or taken advantage of by a principal to avoid liability.

*Biel, Inc. v. Kirsch,* 159 N.E.2d 575, 575–76 (Ind.1959).

In *Parrott v. Ellis Trucking Co.,* 179 F.Supp. 534, 534–35 (S.D.Ind.1960), a district court in Indiana, based upon *Biel* and the comments quoted above, struck an employer's affirmative defense to a respondeat superior claim where the defense was based upon the fact that the employee tortfeasor had died.

The reasoning of these cases is persuasive. Gerald's alleged respondeat superior liability arose at the time Keiser committed the alleged acts and those facts have not changed. Once Keiser acted, any stigma upon Gerald immediately attached and has not been proven false. The facts necessary to find Gerald liable—such as whether Keiser acted within the scope of his employment—can still be established.

As noted by some of the courts above, the current situation is not equivalent to one where the employee has been exonerated and therefore the employer is as well. The situation instead is like one where the employee has been given relief from civil liability because of a type of immunity. *See* Restatement (Second) of Torts § 217 cmt. b ("immunity" denotes the absence of civil liability for what would be a tortious act but for the actor's status). An agent's immunity from civil liability for an act does not translate into a defense for the principal. Restatement (Second) of Torts § 217(b)(ii). "[I]t has been

held that a finding of no civil liability on the part of an employee because of an immunity doctrine does not shield the employer, since the servant's negligence or wrongful act, and not the servant's own civil liability, establishes the employer's liability under respondeat superior." 27 Am.Jur.2d § 469 (1996). Immunities are not delegable and are available only to persons who have them. Restatement (Second) of Torts § 217 cmt. b. Gerald provides no legal basis upon which to transfer to it the personal benefit created by Wisconsin's survival laws. The fact that Wisconsinites believe estates should not face punitive claims does not automatically convert into a public policy benefitting corporations whose employees die.

While the punitive nature of a WOCCA claim raises questions regarding the applicability of the respondeat superior doctrine at all, *see, e.g., D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d 964 (7th Cir.1988), that is a question for another day. In the meantime, the WOCCA claim abates against Keiser but not against Gerald.

## IV. Motion to Dismiss or Transfer

### A. Personal Jurisdiction and Dismissal

■ Pursuant to Federal Rule of Civil Procedure 12(b)(2) the administrator of Keiser's estate contends that this court has no personal jurisdiction over Keiser or it and the case therefore must be dismissed. Plaintiffs have the burden of proving personal jurisdiction exists, *Dietrich by Padway v. Wisconsin Patients Compensation Fund,* 169 Wis.2d 471, 478, 485 N.W.2d 614 (Ct.App. 1992), although the burden is not a heavy one, 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (2d ed.1990). In support of jurisdiction the plaintiffs have proffered the allegations in their complaint as well as deposition testimony and affidavits, which the court may receive and weigh to assist it in determining the jurisdictional facts. *O'Hare Int'l Bank v. Hampton,* 437 F.2d 1173, 1176 (7th Cir. 1971).; *Cram v. Medical College of Wis.,* 927 F.Supp. 316, 319 (E.D.Wis.1996). The plaintiff need only make a prima facie showing that personal jurisdiction exists, and the court will take as true the plaintiffs' allega-

tions and resolve all factual disputes in their favor. *O'Hare*, 437 F.2d at 1176; *Cram*, 927 F.Supp. at 319.

A federal court sitting in diversity analyzes personal jurisdiction by first determining whether the forum state's long-arm statute confers personal jurisdiction and then deciding whether personal jurisdiction would comport with due process requirements. *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 391, 394 (7th Cir.1994). In Wisconsin, compliance with the long-arm statute is presumed to be compliance with due process requirements; defendants have the burden of overcoming the presumption. *Marsh v. Farm Bureau Mut. Ins. Co.*, 179 Wis.2d 42, 53, 505 N.W.2d 162 (Ct.App.1993).

The plaintiffs rely on only one subsection of the Wisconsin long-arm statute, the specific jurisdiction language of Wis. Stat. § 801.05(4)(a), which provides for personal jurisdiction

> [i]n any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury ...
>
> (a) Solicitation or service activities were carried on within this state by or on behalf of the defendant[.]

While a single act causing injury may be enough to satisfy due process concerns, the long-arm provision cited requires at least one additional contact—a solicitation or service activity—to meet the test of jurisdictional sufficiency. *Dietrich*, 169 Wis.2d at 479, 485 N.W.2d 614. The long-arm statute, though, is to be liberally construed in favor of exercising jurisdiction. *Schroeder v. Raich*, 89 Wis.2d 588, 593, 278 N.W.2d 871 (1979); *Dietrich*, 169 Wis.2d at 478, 485 N.W.2d 614.

The estate argues that Keiser himself never conducted solicitation or service activities within Wisconsin at the time of the injury and that none of Michael's solicitations can be considered "on behalf of" Keiser in order to confer personal jurisdiction. I disagree for two reasons.

First, plaintiffs have presented prima facie evidence that Keiser himself conducted solicitation activities within Wisconsin during the time of plaintiffs' injuries. Michael stated at

deposition that when he and Keiser discussed how they could fool Nick Schimpf and his accountant into believing that Michael's account at Gerald was large, Keiser "suggested to me that if I make a deposit with a check, a personal check that it would show as being hard funds for several days". Michael's Dep. at 16–17.

The estate urges that I disregard Michael's testimony because he is an admitted crook and therefore unreliable. While the estate has not proffered any affidavits of its own in regard to its motion, it points to some contradictory testimony from Keiser's deposition, which plaintiffs included with their response. All credibility determinations must be made in plaintiffs' favor at this stage, however. *O'Hare*, 437 F.2d at 1176; *Cram*, 927 F.Supp. at 319. Plaintiffs need only establish personal jurisdiction with prima facie evidence, and taking Michael's testimony as true, they have, as the above is a solicitation by Keiser for money to put in a Gerald account. Moreover, Keiser's own deposition testimony supports the exercise of jurisdiction. Although Keiser disavowed any participation in the scheme to fake the amount in the account, his own deposition indicates he did tell Michael "you can wire the money in or you can give us a check" and that in response Michael sent him a check for $441,000, which was deposited into Michael's Gerald account. Keiser's Dep. at 95, 98.

The estate contends that the above solicitation cannot count because it was not made to one of the plaintiffs, basing its argument on Seventh Circuit dicta in *Federated*, 18 F.3d at 393 ("[a]ccording to Wisconsin law, before solicitation triggers § 801.05(4)(a) it must be made by the defendant *to the plaintiff*" (emphasis added)). The cases upon which the Seventh Circuit relied, *Pavlic v. Woodrum*, 169 Wis.2d 585, 486 N.W.2d 533 (Ct.App. 1992), and *Fields v. Playboy Club of Lake Geneva, Inc.*, 75 Wis.2d 644, 250 N.W.2d 311 (1977), however, do not specify that solicitations must be "to the plaintiff" and the text of section 801.05(4)(a) does not so require. *Fields*, in fact, involved a situation where solicitations made by the defendant did not have any relation to the cause of action whatsoever. In *Fields*, Audi was sued for product

**1162**

defects that allegedly caused an automobile accident in which the plaintiff was injured. Evidence showed that during the year prior to the car accident 25 advertisements for Audi appeared in magazines widely distributed in Wisconsin, inviting potential customers to phone toll-free numbers to find the nearest dealer. According to the Supreme Court of Wisconsin these advertising solicitations were sufficient to make Audi amenable to jurisdiction under 801.05(4)(a) (at that time codified as 262.05(4)(a)) for purposes of the car accident lawsuit. According to the court the evidence was "uncontroverted that solicitation of the Audi product was carried on in the state." *Fields,* 75 Wis.2d at 650, 250 N.W.2d 311. *See also id.* at 651, 250 N.W.2d 311 (noting three facts required for jurisdiction as (1) an act outside the state by the defendant, (2) injury to a person within these tate related to the foreign act, and (3) "some additional contact, *not necessarily related to the injury sued on,* which links the defendant to the state" (emphasis added)) (quoting Wis. Stat. § 262.05 revision notes). Wisconsin law controls this issue and it does not require the additional contact for purposes of the long-arm statute to be made to the plaintiffs themselves.

*Fields* and *Pavlic* do indicate, however, that in order for a solicitation to trigger personal jurisdiction the person soliciting must anticipate a direct or indirect financial benefit and thereby subject himself to the jurisdiction of the courts of the state where the solicitation occurs. *Fields,* 75 Wis.2d at 653, 250 N.W.2d 311; *Pavlic,* 169 Wis.2d at 592, 486 N.W.2d 533. Here, that requirement is met. The plaintiffs' Amended Complaint alleges that Keiser received commissions from all funds invested through him with Gerald. Even taking Keiser's version of events as true, he could anticipate either a direct or indirect financial benefit from a $441,000 deposit to one of his accounts. Thus, Keiser's statement telling Michael to send him a check constitutes a solicitation for purposes of long-arm jurisdiction.

Second, construing the Wisconsin long-arm statute broadly as I must, Michael's solicita-

tions of his relatives are considered solicitations "on behalf of" Keiser, based on the theory of apparent agency.[2] In *Pavlic,* 169 Wis.2d at 591, 486 N.W.2d 533, the Wisconsin Court of Appeals analyzed whether principles of apparent authority allowed personal jurisdiction over a defendant. While determining in that case that apparent agency did not exist, the court implicitly recognized the use of apparent authority for purposes of long-arm jurisdiction. In this case, the apparent authority doctrine sweeps Michael's actions into the category of those "on behalf of" Keiser.

An agency exists if there has been a manifestation by the principal to the agent that the agent may act on the principal's behalf. *Id.* Apparent agency is created by conduct of the principal that, reasonably interpreted, causes *a third person* to believe that the principal consents to have an act done on his behalf by the person purporting to act for him. *Id.* For agency by apparent authority to exist, three elements must be present: (1) acts by the agent or principal justifying belief in the agency; (2) knowledge thereof by the principal sought to be held bound; and (3) reliance thereon by the plaintiffs, consistent with ordinary care and prudence. *Pamperin v. Trinity Memorial Hospital,* 144 Wis.2d 188, 203, 423 N.W.2d 848 (1988).

In this case, the Amended Complaint alleges, and no evidence presently contradicts, that at one point in 1990 Eve Schwarzmann telephoned Keiser to inquire about her investment and Keiser "assured [her] that the funds were invested with Gerald, Inc. and that the investment was safe." Amended Complaint at ¶ 25. At deposition Michael stated that Keiser met with Michael's parents in Chicago and "confirmed" the accuracy of forged account statements indicating $1,500,000 in the Schwarzmanns' account. Michael's Dep. at 14–15. Also, Michael's deposition testimony indicates that when he, Nick Schimpf and Nick's accountant visited Keiser at Gerald's office in Chica-

**2.** The parties' briefs on the personal jurisdiction matter focused mainly on whether Michael's solicitations of his relatives could be attributed to Keiser based on a theory of conspiracy. Because personal jurisdiction exists based upon Keiser's own solicitation and the doctrine of apparent agency I do not need to reach that issue of first impression.

go in 1991, Keiser told them that the account held hard funds and that a lot of trading was going on. Michael's Dep. at 16–18. Keiser stated at deposition that he "always operated with Mr. [Michael] Schwarzmann under the guise that [Michael] was going to refer large accounts to me, and a lot of business." Keiser's Dep. at 99–100. Keiser's own actions in responding to Eve Schwarzmann's telephone call, personally meeting with the Schwarzmanns, and meeting with Nick Schimpf and his accountant, constitute conduct by Keiser himself that justifies plaintiffs' reasonable belief that they were such account holders referred by Michael to Keiser. All of these acts by Keiser justified the plaintiffs' reasonable belief that Michael was soliciting money for investment with Keiser and that by giving Michael money to invest they were investing with Keiser. In his role as solicitor of money from the Schimpfs he acted as the purported agent of Keiser, with Keiser's apparent consent.

The elements of apparent authority are met by prima facie evidence. Keiser knew that his actions reasonably caused the plaintiffs to believe that he consented to and authorized Michael to solicit money from them to be turned over to Gerald for investment. And the plaintiffs' Amended Complaint asserts (and no evidence tendered by the estate contradicts) that they relied upon Keiser's comments and assurances when giving more money to Michael. Thus Michael's solicitations can be considered "on behalf of" Keiser for purposes of establishing personal jurisdiction.

The estate really has not attempted to rebut the presumption that constitutional concerns are satisfied. I find in any event that Keiser had minimum contacts with the Wisconsin forum such that maintenance of the suit here does not offend traditional notions of fair play and substantial justice. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Keiser's conduct and connection with Wisconsin were such that he should reasonably have anticipated being haled into court in this state. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). As a result, this court has personal jurisdiction over Keiser and his estate.

**B. Venue and Transfer**

As an alternative to dismissal on jurisdiction grounds, the estate argues that venue is improper in this district and that the case should be transferred to the Northern District of Illinois. A diversity case may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State" or "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...." 28 U.S.C. § 1391(a)(1), (2).

While the estate is correct that venue would lie in the Northern District of Illinois under subsection 1391(a)(1), that does not mean that venue is improper here. According to the complaint and plaintiffs' affidavits, a substantial portion of the underlying events occurred in Wisconsin between Michael and his relatives, satisfying subsection 1391(a)(2). Therefore, a transfer pursuant to 28 U.S.C. § 1406(a) is not appropriate.

Title 28 U.S.C. § 1404(a) allows a transfer "[f]or the convenience of parties and witnesses, in the interest of justice." I find that keeping the case here is more convenient for the parties and witnesses and in the interest of justice. Gerald indicates that the current venue also is more convenient for it, as its attorneys are located here. All twelve individual plaintiffs, who also will be witnesses, reside in Wisconsin. Documentary evidence is mainly in the plaintiffs' hands and thus in Wisconsin. And Michael, who will be called to testify by the plaintiffs and/or Gerald, is located in Wisconsin and subject to this court's subpoena power, but would not be within the Northern District's subpoena power if the case were transferred. This district is more convenient for all involved, with the sole exception of the administrator, and the interest of justice requires that it remain here.

**V. Conclusion**

**THEREFORE IT IS ORDERED** that the motion for reconsideration is **GRANTED** and upon reconsideration the motion for substitution is **GRANTED IN PART** in that Charles F. Marino, administrator of the estate of Edward F. Keiser, is **SUBSTITUTED** for defendant Edward F. Keiser in regard to

counts one and three of the Amended Complaint. The motion for substitution is **DE-NIED** in regard to count two of the Amended Complaint.

**IT FURTHER IS ORDERED** that count two of the Amended Complaint is **DIS-MISSED** as to Keiser only.

**IN ADDITION, IT IS ORDERED** that the estate administrator's motion to dismiss or transfer is **DENIED.**